UNITED STATES of America,
Appellant,

v.

QUATERMAIN, DRAX.

No. 79–1253.

United States Court of Appeals,
Third Circuit.

Argued Nov. 15, 1979.

Decided Jan. 14, 1980.

---

Peter F. Vaira, U. S. Atty., Walter S. Batty, Jr., Asst. U. S. Atty., Chief Appellate Div., James J. Rohn, Asst. U. S. Atty. (Argued), Philadelphia, Pa., Kathleen A. Felton, Crim. Div., Dept. of Justice, Washington, D. C., for appellant.

Douglas Riblet (argued), Alan Turner, Asst. Defender, Defender Association of Philadelphia, Federal Court Div., Philadelphia, Pa., for appellee.

Before SEITZ, Chief Judge, ALDISERT, Circuit Judge, and TEITELBAUM, District Judge.*

## OPINION OF THE COURT

SEITZ, Chief Judge.

The government has filed a timely appeal from a pre-trial order of the district court excluding the testimony of a government witness and any evidence derived from that witness. Our jurisdiction is based on 18 U.S.C. § 3731 (1976).

### I.

In 1977, appellee Drax Quatermain agreed to assist the government in an investigation concerning the illegal manufacture of methamphetamine. Instead of receiving formal witness immunity under 18 U.S.C. § 6002 (1976), Quatermain negotiated an informal immunity agreement with government lawyers that was put in written form in a letter dated June 7, 1977. Under this arrangement, Quatermain agreed to testify in exchange for:

> immunity from prosecution for your participation and involvement with Zelman A. Fairorth and others relating to the manufacture of methamphetamine.

Fairorth subsequently was convicted for illegally manufacturing methamphetamine and was sentenced to a four-year prison term.

While on bail pending appeal, Fairorth became an informant against Quatermain in connection with a government investigation of Quatermain's alleged illegal manufacture of a gun silencer. This illegal conduct allegedly occurred in July and August of 1978, thirteen or fourteen months after Quatermain entered into the immunity agreement relating to the methamphetamine investigation. The government concedes that Fairorth's cooperation was motivated, at least in part, by Quatermain's prior testimony against him. Fairorth bought, with government funds, the materials needed to make a silencer and delivered them to Quatermain. Based on evidence obtained from Fairorth, Quatermain was indicted for possession of a firearm by a person previously convicted of a felony and for four other offenses relating to the manufacture, possession, and transfer of the silencer.

---

* Honorable Hubert I. Teitelbaum, United States District Judge for the Western District of Pennsylvania, sitting by designation.

On November 22, 1978, Quatermain filed a motion to dismiss the indictment, alleging that it was based almost entirely on evidence obtained from Fairorth and that such evidence was derived from Quatermain's prior testimony against Fairorth in violation of the immunity agreement. Because the district court could not determine from the record before it what evidence the grand jury had relied on in returning the indictment, it treated the motion to dismiss as a motion to suppress Fairorth's testimony and any evidence derived from that testimony. It held that Fairorth's testimony was derived from Quatermain's prior cooperation with the government and ordered the testimony and all evidence derived from it excluded. The government subsequently filed the present appeal.

## II.

■ Much of the controversy before the district court centered on the meaning of the immunity agreement between Quatermain and the government that granted Quatermain "immunity from prosecution" for his involvement with Fairorth "relating to the manufacture of methamphetamine." Witness immunity generally is characterized as either transactional immunity or use and derivative use immunity. Transactional immunity "accords full immunity from prosecution for the offense to which the compelled testimony relates." *Kastigar v. United States,* 406 U.S. 441, 453, 92 S.Ct. 1653, 1661, 32 L.Ed.2d 212 (1972). Use and derivative use immunity prohibits the use of compelled testimony or any evidence derived from that testimony against the witness in a criminal prosecution. *See id.* at 452–53, 92 S.Ct. 1653. Under this latter type of immunity, the witness still may be prosecuted for crimes about which he testifies if the government proves that it has other evidence that is derived from a source wholly independent of the compelled testimony.

Quatermain argued in the district court that his immunity agreement granted use and derivative use immunity. The government's position is more difficult to as-

certain. It characterized the immunity as both transactional and use immunity, but asserted that whatever title was used, the immunity was limited to immunity from prosecution for Quatermain's participation in the manufacture of methamphetamine.

The district court found that the immunity agreement was ambiguous on its face and therefore considered the context surrounding the agreement to interpret its meaning. The court relied on several factors in making its decision. First, it found no evidence that Quatermain had been informed of the scope of his fifth amendment privilege against self-incrimination or that he had knowingly and intelligently waived it. Second, it noted that Quatermain was not represented by counsel when he negotiated the immunity agreement with government lawyers. Third, the agreement gave Quatermain "immunity from prosecution" without specifically excluding use and derivative use immunity. Finally, it relied on the fact that the government had referred to the immunity as use immunity in its answer to the motion to dismiss and had refused to withdraw this characterization when questioned in open court.

Based on these considerations, the district court found that Quatermain agreed to testify in exchange for the minimum immunity required by the Constitution to compel a witness to testify. Relying on the Supreme Court's holding in *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), that use and derivative use immunity was constitutionally sufficient to compel testimony over a claim of the privilege against self-incrimination, the district court concluded that Quatermain had been granted use and derivative use immunity.

On this appeal, the government argues that Quatermain's testimony against Fairorth was not compelled because Quatermain volunteered to help the government in its methamphetamine investigation. Therefore, it contends that use and derivative use immunity is not required in this case by the fifth amendment, which prohibits only the use of compelled testimony, *see Fisher v.*

*United States,* 425 U.S. 391, 397, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976), and that the district court erred in finding the immunity agreement granted the constitutional minimum. It argues that the immunity conferred in this case was narrower, limited to immunity from prosecution for participation in the methamphetamine scheme.

In view of our conclusions, however, we deem it unnecessary to decide whether, under the procedure used by the government here, Quatermain's testimony was in any way compelled or whether he knowingly and intelligently waived his privilege against self-incrimination by agreeing to testify in exchange for immunity that was not commensurate with his fifth amendment privilege. Instead, we will assume, without deciding, that the district court correctly found that the informal agreement conferred the minimum immunity required by the Constitution to compel a witness's testimony after the witness has claimed the privilege. Therefore, we now must consider whether it follows from this assumption that Fairorth's testimony and evidence derived from it must be excluded in this case.

## III.

After holding that the immunity agreement conferred use and derivative use immunity on Quatermain, the district court concluded that Fairorth's testimony against Quatermain was a derivative use of Quatermain's immunized testimony because it was motivated, at least in part, by Quatermain's previous testimony that had resulted in Fairorth's conviction. *See United States v. Kurzer,* 534 F.2d 511 (2d Cir. 1976). Therefore, it ordered the exclusion of Fairorth's testimony.

The government does not contest the district court's finding that Fairorth's testimony was motivated by Quatermain's prior cooperation with the government in its prosecution of him. However, it contends that the district court improperly extended the scope of the immunity granted in this case. It argues that the scope of Quatermain's fifth amendment privilege against self-incrimination does not extend to crimes

that he might commit in the future and that are unrelated to his prior immunized testimony. Therefore, it asserts that the immunity given Quatermain, which was granted to remove the danger of self-incrimination, did not require exclusion of Fairorth's testimony relating to the manufacture of the silencer.

In *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), the Supreme Court held that to compel testimony over a claim of the privilege against self-incrimination, "a grant of immunity must afford protection commensurate with that afforded by the privilege, [but] it need not be broader." *Id.* at 453, 92 S.Ct. at 1661. The Court upheld the constitutionality of the federal immunity statute, *see* 18 U.S.C. § 6002 (1976), which provides for use and derivative use immunity, because it found that "such immunity . . . is coextensive with the scope of the privilege against self-incrimination." 406 U.S. at 453, 92 S.Ct. at 1661.

We are not presented in this case with the question whether a grant of use and derivative use immunity can afford a witness protection against self-incrimination that is broader than the protection provided by the constitutional privilege because here the district court construed the parties' agreement to confer the minimum immunity required by the Constitution. Under this construction, the purpose of the grant of immunity was to afford protection against self-incrimination to the same extent as the fifth amendment privilege. Therefore, the immunity granted in this case is limited by the scope of the privilege. If Quatermain could not have invoked the privilege when he testified against Fairorth on the ground that Fairorth might testify against him concerning crimes that might be committed in the future, then the immunity granted here does not preclude use of Fairorth's testimony against Quatermain.

The Supreme Court on many occasions has stated that the purpose of the privilege against self-incrimination is " 'to insure that a person should not be compelled, when acting as a witness in any

investigation, to give testimony which might tend to show that he himself *had committed a crime.*'" *Lefkowitz v. Turley,* 414 U.S. 70, 77, 94 S.Ct. 316, 322, 38 L.Ed.2d 274 (1973) (quoting *Counselman v. Hitchcock,* 142 U.S. 547, 562, 12 S.Ct. 195, 35 L.Ed. 1110 (1892) (emphasis added)). Thus, the privilege usually applies to prohibit testimony that might incriminate a witness for past crimes. *See Rule v. United States,* 362 F.2d 215, 217 (5th Cir. 1966), *cert. denied,* 385 U.S. 1018, 87 S.Ct. 744, 17 L.Ed.2d 554 (1967).

In *Marchetti v. United States,* 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968), however, the Court held that the privilege was not entirely inapplicable to prospective acts. There, the defendant was convicted for violating federal wagering tax statutes due to his failure to pay an occupational tax and to register with the government before engaging in the business of accepting wagers. He argued that the statutory obligations to pay the tax and to register increased the likelihood of prosecution for future gambling activity.

The Court rejected the premise that the privilege against self-incrimination applied only to prior conduct and held that:

> The central standard for the privilege's application has been whether the claimant is confronted by substantial and "real," and not merely trifling or imaginary, hazards of incrimination.

*Id.* at 53, 88 S.Ct. at 705. Although it recognized that "prospective acts will doubtless ordinarily involve only speculative and insubstantial risks of incrimination," *id.* at 54, 88 S.Ct. at 705, it found that the hazard of incrimination created by the tax statutes was substantial because the information derived from the statutory requirements "may serve as decisive evidence that [registrants] have in fact subsequently violated state gambling prohibitions." *Id.*

The Court emphasized the narrowness of the privilege's application to future conduct in *United States v. Freed,* 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971). In that case the Court upheld the constitutionality of provisions of the National Firearms Act that required registration of a firearm before it could be transferred to a new owner. The statute in question provided that no information produced by compliance with the Act could be used in a criminal proceeding relating to a prior or concurrent violation of the law. *Id.* at 604, 91 S.Ct. 1112. Based on this statutory immunity and the practice of not making registration data available to other federal or state agencies, the Court held that the defendant was not confronted by any "substantial and real" hazard of incrimination. In response to the defendant's claim that the disclosure required by the statute might incriminate him in the future, the Court concluded that this argument:

> assumes the existence of a periphery of the Self-Incrimination Clause which protects a person against incrimination not only against past or present transgressions but which supplies insulation for a career of crime about to be launched. We cannot give the Self-Incrimination Clause such an expansive interpretation.

*Id.* at 606–07, 91 S.Ct. at 1117.

We think that the present case is distinguishable from *Marchetti* and does not fit within the narrow category of cases where the privilege against self-incrimination permits a witness to refuse to testify because of the possibility that such testimony will incriminate the witness concerning future criminal conduct. The Court found a "substantial and real" risk of incrimination in *Marchetti* because the information required by the wagering statute significantly enhanced the likelihood of the registrant's prosecution for future gambling activities. The future conduct involved there was part of a continuing course of similar criminal activity. The subsequent offense in this case, however, was not the result of a continuous criminal enterprise and involved a different type of criminal activity.

Quatermain has cited no cases, and our research has revealed none, where the fifth amendment privilege against self-incrimination has been held to apply to a witness who refuses to testify because he asserts that his testimony somehow may be used to

incriminate him in a prosecution for a different type of criminal act that he may commit in the future. Indeed, two courts have rejected similar claims, finding that the hazard of incrimination arising from one's possible commission of a wholly different criminal act at some time in the future is too speculative and remote to merit fifth amendment protection. *See Desimone v. United States*, 423 F.2d 576, 581–82 (2d Cir.), *cert. denied*, 400 U.S. 842, 91 S.Ct. 84, 27 L.Ed.2d 77 (1970); *Varitimos v. United States*, 404 F.2d 1030, 1034 (1st Cir. 1968), *cert. denied*, 395 U.S. 976, 89 S.Ct. 2126, 23 L.Ed.2d 765 (1969).

■ Therefore, we find that Quatermain could not have relied on the privilege against self-incrimination to refuse to testify about Fairorth's involvement in the illegal manufacture of methamphetamine on the ground that the testimony given might incriminate him if he committed a different type of crime in the future. Because the privilege against self-incrimination does not extend to such future conduct and because the district court held that the parties' informal immunity agreement granted Quatermain the minimum immunity required to protect his constitutional privilege, the immunity granted Quatermain necessarily does not preclude use of Fairorth's testimony against Quatermain in the prosecution for offenses relating to the manufacture of the silencer.

### IV.

The order of the district court, which treated Quatermain's motion to dismiss the indictment as a motion to suppress evidence, will be reversed.

After the district court entered the order here appealed, but before this appeal was filed, it entered another order dismissing the indictment because the government could not proceed without using evidence obtained from Fairorth. It is not clear to us why the government did not appeal this latter order. Nevertheless, in light of our disposition of this appeal, we assume that the government will make an appropriate application in the district court with respect to the order dismissing the indictment.

ALDISERT, Circuit Judge, dissenting.

In the folklore of crime, the principals in this case might not generate the popular appeal of Butch Cassidy and the Sundance Kid, but in time they may become folk heroes to a growing fraternity of government informers, known as "snitchers" in the popular parlance. Notwithstanding their telegenic names, Drax Quatermain and Zelman A. Fairorth did not start out to make new law. They had other, more exciting things to do than to become embroiled in an academic discourse on the niceties that distinguish transactional and derivative use immunity. For his part, Fairorth was content to make a fast buck by concocting and peddling methamphetamine. Quatermain was more a generalist. Not only did he violate federal laws, he found a few state laws to break as well. And after entering into a contract with federal agents to snitch on Fairorth, he settled down to a quiet life of making silencers for his friends and customers, to whom the piercing sounds of gunfire in their business pursuits was anathematic.

Viewed against the record in this case, Drax Quatermain and Zelman Fairorth were not immoral men; they were amoral. Quatermain was pleased to make a deal in which, for his part, he would snitch on Fairorth and help the federal authorities salt him away. Having performed his end of the bargain, he saw nothing wrong with later approaching Fairorth to propose that they enter into a joint venture of their own. We have been spared the clinical details of this caper, the record disclosing only that it was just "another illegal scheme involving their committing a crime unrelated to methamphetamine." Appendix at A–109. We may surmise, however, that before discussing the details of his proposition, Quatermain delivered a message reminiscent of Mario Puzo's *The Godfather*, "About my testifying against you, Zelman old friend, forget it. It was nothing personal. Only business." To which Zelman probably responded, "Sure, sure. I understand, pal,"

and then promptly ran to the federal authorities to make his deal whereby, for some yet undisclosed consideration, he would deliver Quatermain to them on the silencer charge.

This delightful scenario featuring Zelman and Drax suggests that another bulwark of society—honor among thieves—is in danger of crumbling. The government, for its part, is promoting the disintegration process. As an equal opportunity employer it perceives no breach of morals in using a snitcher to convict a snitchee, and then later enlisting the snitchee to snitch on the snitcher.

I relate this factual background, somewhat extravagantly to be sure, because I think this is an important case. The use of government informers is critical in obtaining convictions in federal prosecutions, and it is therefore essential that the considerations of public policy governing this case be placed in proper perspective. To me, this is not a case of transactional or use immunity. Indeed, as the majority properly observe, this is not a case of formal witness immunity under 18 U.S.C. § 6002. Decisions interpreting that statute, e. g., *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), while tangentially relevant, are not controlling. Stripped to its essence, this case is an odd mix of civil contract and estoppel law thrust into the context of a criminal prosecution. Notwithstanding the ambiguous language quot-

ed by the majority, which is only part of the agreement reached between the United States attorney and Quatermain, I view the bargain between the government and Quatermain as an *agreement not to prosecute*, not as one conferring immunity.[1]

## I.

The starting point of my analysis is that no assistant United States attorney, and indeed no United States attorney, has the power or authority to grant immunity under the federal immunity statutes. The United States attorney has the authority to request that a witness be subpoenaed to testify before certain tribunals. If the witness invokes the fifth amendment and refuses to testify, the operation of the immunity statute comes into play:

> [Whenever] the person presiding over the proceeding communicates to the witness an order issued under this part, the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order.

1. The letter states in full:

This letter is to confirm our understanding with respect to your cooperation with the Drug Enforcement Administration and the United States Attorney's Office in its investigation of Zelman A. Fairorth and others who are allegedly involved in the manufacture of methamphetamine. It has been agreed that in return for your cooperation and truthful testimony in any court proceeding related to these matters that the Government will provide you with immunity from prosecution for your participation and involvement with Zelman A. Fairorth and others relating to the manufacture of methamphetamine. It is further agreed that at the completion of our investigation the Government will provide you with a letter setting forth the extent of your cooperation and the results of that cooperation in terms of seizure of contraband and prosecution of suspected violators. Final-

ly, it is understood that application has been made on your behalf to include you and your family under the Department of Justice witness protection plan. In the event that you are not accepted into the witness protection plan the Drug Enforcement Administration has agreed to provide you with the same services and protections afforded by the Department of Justice witness plan.

The Government represents that it has contacted the appropriate officials of the Pennsylvania Department of Parole and has received approval for your assistance in this investigation.

Very truly yours,
David W. Marston
United States Attorney
By: ————————————
Edward S. G. Dennis, Jr.
Assistant U. S. Attorney
Appendix at A–106.

18 U.S.C. § 6002. Should the witness persist in his refusal to testify, the United States attorney may *request* a court to order him to testify, and if duly requested by the United States attorney, the court has *no* discretion to refuse to issue the order. 18 U.S.C. § 6003.

Given the limitations of this statute and its predecessors, a practice has developed through the years whereby United States attorneys, on an *ad hoc* basis, make informal arrangements with witnesses that, although described informally as "grants of immunity" or, in Western Pennsylvania, where I practiced law, as "hip pocket immunity," are really discretionary agreements not to prosecute. The authority to enter these agreements stems not from a specific federal immunity statute but from the power vested in United States attorneys giving them extensive discretionary authority to prosecute or not to prosecute a given case. In exercising his discretion not to prosecute a particular witness or informant, the United States attorney is at liberty to impose conditions that usually relate to testifying or providing certain information. For his part, the putative witness or informant often imposes conditions of his own, usually relating to agreements not to prosecute but often covering other matters as well, as was the case here. Quatermain sought and obtained from the government the following conditions as the *quid* for his *quo* of testifying against Fairorth:

1. An agreement not to prosecute, the precise meaning of which is in dispute here.

2. A letter showing the extent of his cooperation and the result in terms of seizure of contraband and prosecution of suspected violators.

3. An application to include him and his family under the Department of Justice witness protection plan.

4. Alternatively, a promise by the Drug Enforcement Administration to include him and his family in its witness protection plan.

5. Approval from the Pennsylvania Department of Parole allowing Quatermain to cooperate with the federal authorities.

*See* note 1, *supra.*

A bargain having been struck between the government and Quatermain, it seems to me that the question before us is whether there was a breach of that agreement. It must be conceded that the government will be required to respect the obligation it incurs by such an agreement. In a related context, the Supreme Court teaches that "when a [guilty] plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Santobello v. New York,* 404 U.S. 257, 262, 92 S.Ct. 495, 499, 30 L.Ed.2d 427 (1971). When a promise is not fulfilled, the Court has described this as "a breach of agreement" and has emphasized that inadvertence of the breach does not lessen its impact. *Id.* The government's appeal then, in my view, stands or falls on the proper interpretation of its obligation under the agreement it made with Quatermain.

II.

Traditionally, the trial court determines the factual content of any agreement. I see no reason to depart from that practice in this appeal. Here the sole factual controversy is over the extent of the prosecution's promise not to prosecute. The government insists that its promise was limited to withholding prosecution only in cases involving Fairorth and relating to the manufacture of methamphetamine, and that therefore it cannot have breached any agreement by prosecuting a subsequent crime involving the manufacture or distribution of silencers for firearms. Simply stated, it is the government's position that the agreement focused on activities and those activities were limited to the manufacture and distribution of methamphetamine.

Quatermain has a different view. He puts the emphasis, not on activities, but, in the words of the letter agreement, on *any* "*involvement* with Zelman A. Fairorth."

(my emphasis). His argument is basically an argument of the street. Because among the denizens of the underworld a police informant is not exactly a *persona grata*, the snitch must be protected from any retaliation by the person snitched on—*any* retaliation, be it physical harm necessitating protection under a witness protection program, or, as here, a subsequent prosecution against him inspired by Fairorth. Based on the letter and the testimony adduced at the hearing, Judge Shapiro found the agreement ambiguous, 467 F.Supp. at 789, and then resolved the ambiguity by making certain factual determinations.

In the district court, and on appeal, the government concedes that Fairorth's cooperation with the government "at least in part . . . is derived from the prior cooperation of [Quatermain] with the Government in the prosecution of Zelman Fairorth." Appendix at A–104; *see* Appellant's Brief at vi. Thus a critical causal relationship between the two cases was conceded by the government. It was then left for the district court to make findings on whether the parties intended that the agreement not to prosecute extend to activities occurring after the striking of the bargain or to activities other than the illegal manufacture of drugs. The court found adversely to the government on both points. Although the district court phrased its legal discussion in terms of transactional and use immunity, an analysis that I would not particularly endorse except in cases implementing the immunity statute, I arrive at the same result. Judge Shapiro reasoned that, inasmuch as at the striking of the bargain the government was represented by lawyers and Quatermain was not, she would "construe any ambiguities in the letter against the government." 467 F.Supp. at 788. She then proceeded to examine other evidence including testimony from DEA special agents that they instructed Quatermain "that he had to call them for authorization before engaging in any other illegal conduct . . . ." *Id.* at 789.

Applying the clearly erroneous rule, *United States v. Delerme*, 457 F.2d 156, 159–60 (3d Cir. 1972), I would hold there is sufficient evidence in the record to sustain a factual finding that the parties intended that the promise not to prosecute extends to the instant prosecution. First, this prosecution involved Fairorth; second, Fairorth's motivation to inform on Quatermain resulted directly from Quatermain's testifying against him; and third, there was evidence that Quatermain was given some kind of license to participate in future illegal activities as testified to by Drug Enforcement Special Agent Donn Jerre Miller, Appendix at A–123, A–132.

### III.

Experienced federal judges recognize that informers play an important role in prosecution under federal statutes. They also recognize that given the frequent use of no-prosecution agreements we are forced to live in a society where one who is guilty of transgressing the law will often go unpunished so that another, equally guilty, may be the target of the prosecution. The ultimate choice of who is to be prosecuted is not left to the courts, but is committed to the discretion of the United States attorneys.[2] It is therefore to be expected that no-prosecution agreements will be controversial and subject to scrutiny. While recognizing that in entering these agreements the government is not negotiating with Sunday School teachers and that the negotiations may be, if not loathsome, at least unpleasant experiences, it seems to me a clearer understanding of the bargain than that presented by the facts of this case should be the *sine qua non* of any such undertaking. Conditions describing the extent of no-prosecution should be set forth with maximum specificity. The courts should put a premium on such specificity and impose a penalty on generality. Especially when, as here, the informant is not

---

2. Professor Kenneth Culp Davis puts what he describes as the "central question about justice" thus: "If *A* and *B* are equally deserving of prosecution, or if *A* is more deserving of prose- cution than *B*, is a decision to prosecute *B* but not *A* unjust?" Quoted in R. Aldisert, The Judicial Process 772 (1976); *see also* K. Davis, Administrative Law Text § 4.09 (3d ed. 1972).

represented by counsel, the burden of proving the limitations of the no-prosecution provisions of the agreement should be on the government and ambiguities resolved against it, as they would be against the drafter of any written instrument. I recognize that the putatively criminal party to such agreements may be guilty of antisocial and reprehensible acts, but in the context of the law of bargains, he stands on equal footing with the government, and, if not represented by counsel, he should be entitled to the benefit of the doubt in interpreting agreements.

I defend this position because of the sensitive dictates of public policy that inhere in any decision by a prosecutor not to prosecute when there is probable cause to believe that the witness or informant is guilty. At the very least, the agreement should explain exactly what is being surrendered by the prosecutor and what the government is receiving in return.

Accordingly, I would affirm the judgment of the district court.