**UNITED STATES of America**

v.

**Raymond A. HOSSBACH, David M. McCally.**

**Crim. No. 80–148.**

United States District Court, E. D. Pennsylvania.

July 15, 1980.

---

Walter S. Batty, Jr., Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Thomas Colas Carroll, Philadelphia, Pa., for Hossbach.

Richard P. Hunter, Jr., Philadelphia, Pa., for defendants.

## OPINION AND ORDER

VanARTSDALEN, District Judge.

Defendants are charged in a four count indictment with violations of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 801, et seq. Count 1 charges both defendants with conspiracy to manufacture and distribute PCP and methamphetamine, Schedule II controlled substances. The conspiracy is alleged to have existed from about November 24, 1976 until about April 17, 1980. Defendant Raymond A. Hossbach (Hossbach) is charged in Count 2 with possession with intent to distribute one kilogram of PCP on January 13, 1980 and in Count 3 with distribution of one kilogram of PCP on January 13, 1980. David M. McCally (McCally) is charged in Count 4 with possession with intent to distribute one kilogram of PCP on January 13, 1980. (Apparently Counts 2, 3 and 4 involve the same kilogram of PCP.)

Pretrial motions involving multiple issues were filed. Except for certain motions to suppress evidence, all other pretrial motions were resolved during the course of omnibus pretrial hearings, either by agreement of counsel or by rulings from the bench. The suppression motions present complex problems involving disputed facts as well as unclear rules of law. Counsel for both the government and the defendants have filed commendably thorough and helpful post-hearing briefs.

There are three major issues. In summary they involve (1) the right of the Drug Enforcement Agency (DEA) to obtain evidence in furtherance of a purely criminal investigation through the use of "administrative subpoenas" issued pursuant to 21 U.S.C. § 876; (2) the effect of both formal and informal immunity granted to Hossbach at a time when the charged conspiracy is alleged to have been "on-going"; and (3) the validity of three warrantless searches of premises alleged to have been abandoned by one or both defendants. Because the investigation developed through the accumulation of evidence built upon other evidence, the three problems become interrelated by reason of the well settled doctrine that the fruits of illegally obtained evidence must be suppressed along with the illegally obtained evidence itself. The issues are complicated not only by factual disputes but by the continuing problem of what used to be generally denominated as "standing," but was recently redefined in *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); and *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980).

## I. CHRONOLOGY OF THE INVESTIGATION

An outline of the chronology of the DEA investigation is helpful in understanding the problems. A summary of most of the investigation appears of record in the affidavit of DEA special agent Donn Jerre Miller (Miller), upon which the magistrate predicated his finding of probable cause and issued arrest warrants on April 16, 1980. From this affidavit and evidence presented at the suppression hearings, the investigation's progress may be capsulized as follows.

In January, 1979, a chemical company in Mt. Vernon, New York, Freeman Industries, reported to the New York DEA office that a large quantity of a specified chemical had been sold to a business located at Ford Road Industrial Park, in Bristol Township, Pennsylvania. The purchaser's name was Markex. Freeman Industries apparently supplied this information as a routine report. Whether the report was required by regulations or in some other manner compelled, or whether it was purely volunteered, is not clear from the record.

Agent Caputo of the New York office of DEA forwarded the information to the Philadelphia DEA office, which information included the telephone number of Markex as shown on Freeman Industries' records. The Philadelphia DEA office instituted a criminal investigation into possible illegal drug manufacturing, because the type and quantity of chemicals ordered by Markex from Freeman Industries were suspect.

Agent Miller of the Philadelphia DEA office inquired of local chemical and laboratory equipment distributors as to any orders or purchases by Markex of Ford Road Industrial Park. He learned that Markex had placed an order with Arthur H. Thomas Company. Thereafter, DEA agents observed a person who identified himself to Arthur H. Thomas Company as John Mark Williams, later identified as the defendant McCally, pick up an order on behalf of Markex. They also ascertained that the car in which the pick-up was made bore a license plate later determined to be registered in the name of McCally at an address in Knights Terrace, Philadelphia, Pennsylvania.

Investigators also telephoned the number that Freeman Industries had for Markex and received a reply from Able Answering Service. Armed with a subpoena issued by DEA pursuant to 21 U.S.C. § 876, agents obtained all of the records of Able Answering Service concerning Markex. From these records, they ascertained that Markex subscribed to Able Answering Service through a man identified as John Mark Williams, who provided Able Answering Service with two telephone numbers, one of them his residence, where he might be reached. Again utilizing the subpoena power, agents obtained from the Bell Telephone Company subscriber information indicating that the one telephone was listed under the name of David M. McCally, Knights Terrace, Philadelphia, and the other telephone was listed under the name of John Mark Williams, at an apartment located on Ditman Street in Philadelphia.

A warrantless search of the Ditman Street apartment was later conducted. The basis for the search was the consent of the landlord, who informed the DEA agents that the apartment had been rented in the name of John Williams, but that Williams was in arrears in the rent and had apparently vacated the premises. The room indeed appeared to be vacant and unused, except for an operable telephone. The phone bore a number that the investigators had previously obtained from the Bell Telephone records secured under a subpoena.

No other evidence was "seized" in the Ditman Street apartment search.

Again armed with a subpoena, investigators went to the rental agent or owner of the Ford Road Industrial Park and learned that Markex had rented unit 12, consisting of a large storage area with a loading dock and a front office space and sanitary facilities. Investigators learned from adjoining tenants that no one had been seen on the premises of unit 12 for some time, and that only one or two persons at most had ever been seen there during the period when unit 12 was under rent to Markex. Surveillance confirmed this information. However, an outside mail receptacle was observed sometimes full and other times empty. The landlord advised that although the lease term had not expired, the tenant was in arrears on the rental payments in some unspecified sum and for an unspecified period. The day following inquiry of the landlord by DEA agents, the landlord advised DEA agents that he was retaking possession for nonpayment of rent. The landlord provided DEA agents with a key and permission to enter unit 12 and seize any property they believed to be of assistance in the investigation.

The warrantless search of unit 12 at the Ford Road Industrial Park disclosed some office furniture, a file or filing cabinet with what appeared to be office and business records of Markex, certain personal belongings indicating the possibility of continuing utilization of the unit, in part, as living quarters, as well as quantities of chemicals and laboratory equipment and a considerable quantity of trash.

The office records were all seized. Also, apparently at a later date, again without a warrant, agents seized a typewriter (about which an expert will apparently testify as to fingerprints and/or the typing of other documents relevant to the evidence). The records included invoices and correspondence.

One additional important piece of evidence was seized during the warrantless search of unit 12. A letter, addressed to

"Whom It May Concern," and bearing the signature of "Dr. Shock" was found, possibly in the trash within the building. This letter appeared to be a resume or curriculum vitae of a person purporting to be an experienced chemist who offered to manufacture methamphetamine, upon being supplied with the chemicals and laboratory equipment, at a price of $10,000 per kilogram. This letter constituted either the original lead or, at least, a strongly corroborative circumstantial lead, that Hossbach was involved as the chemist co-conspirator, based on the style of the writing, the facts set forth in the letter, the unusual use of the word "kilo" (most illegal drug dealers preferring to make sales in grams, ounces and pounds), and other unusual aspects of the letter.

Agent Miller was aware that Hossbach had been involved in an illegal drug operation in California some years prior to the present investigation, and that in connection with other drug cases, Hossbach had thereafter been given formal immunity and had testified under grant of immunity. Philadelphia DEA Agent Ellis Hershowitz was the DEA agent who actively conducted the investigation in which Hossbach testified under immunity. Agent Hershowitz also conducted 50 to 100 hours of "debriefing" of Hossbach in connection with other drug investigations in which Hossbach was cooperating under an informal grant of immunity. The formal and informal grants of immunity occurred subsequent to the California offenses but prior to the commencement of the investigation culminating in the present indictment.

Agent Miller acknowledges that he conferred with Agent Hershowitz about the "Dr. Shock" letter and that both agents agreed that this letter was probably composed by Hossbach. The names of Hossbach and Dr. Shock had also in some prior investigation been associated together in some manner, and Hossbach was known to have utilized the metric system of measurements in drug transactions in which he was involved—hence the connection with the word "kilo." Neither agent was specific as to whether this information originated prior

to or during the course of the proceedings as to which Hossbach was immunized, although Agent Miller's testimony is to the effect that all of this knowledge was acquired by him prior to any grant of immunity to Hossbach, and that his conferring with Agent Hershowitz was merely confirmatory of his independent conclusions.

Agent Miller also contends that Hossbach's association with the presently charged conspiracy was ascertained by another separate line of investigation. Through the use of "administrative subpoenas" issued to Bell Telephone Company, the toll records of calls from the Ditman Street apartment rented in the name of John Mark Williams revealed a substantial number of calls to a particular number which, again through use of "administrative subpoenas," was determined to be listed under the name of Jann Alexander of 662 Swamp Road, Furlong, Doylestown Township, Pennsylvania. Agent Miller thereupon made a routine telephone inquiry of the Doylestown Township Police and was advised that a man using the name of Supernovich was living with Jann Alexander at the Swamp Road address. Supernovich was then or later known or ascertained by Agent Miller to be Hossbach. A surveillance was then placed on the Swamp Road residence and on Hossbach, who drove a BMW registered in his own name at a Chalfont, Pennsylvania, address.

Subsequently, to assist in the surveillance of Hossbach, Agent Miller made a formal application and obtained written authorization from Magistrate Hall of this district to place an electronic tracking device, sometimes called a "bumper beeper," on the Hossbach car. Aided in part by this device, Agent Miller followed Hossbach to an establishment in Cherry Hill, New Jersey, engaged in the business of renting individual self-lock warehouse storage sheds (similar to a row of private car garages). Armed with another "administrative subpoena," Agent Miller obtained from the rental agent information that the locker space in question had been rented as unit 394 under the name of Jann Alexander. Agent Miller

obtained permission to install a continuous operating TV camera in a location focused onto unit 394.

While a few days remained on the current rental of unit 394, the owner notified DEA that the unit had been left with the door ajar and apparently vacated. At the request of the DEA, the owner relocked the door and then afforded DEA agents access with the passkey when they arrived. A prior review of the video tape disclosed that several days earlier, two persons, tentatively identified as McCally and Hossbach had come to the locker with a rental truck. McCally used a key to unlock a separate padlock, in addition to the regular locker key, and the two men proceeded to remove a large quantity of cartons and equipment from the locker and place them in the truck. The door of the rental unit was left ajar when they left, and McCally removed and took the padlock with him. The agents seized a substantial quantity of evidence from the locker, including various pieces of apparently broken and discarded laboratory equipment and various quantities of chemicals. Several days after this warrantless search and seizure the locker keys were received by the owner in the mail, the keys having been mailed from Ohio.

There was a substantial amount of additional evidence obtained concerning Markex's dealings with other business enterprises, and long distance telephone calls to or from one or more of the McCally or Hossbach residences or telephone addresses, which evidence was obtained either directly or indirectly through the use of the "administrative subpoenas." From these leads, agents were able to identify and locate other persons whom the government will contend at trial were co-conspirators (though unindicted) with present defendants.

## II. ADMINISTRATIVE SUBPOENAS

Substantial evidence and leads to other evidence were obtained by DEA investigating agents utilizing subpoenas, asserting authority under Title II, Section 506 of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 876(a). That statute provides, in part:

In any investigation relating to his functions under this subchapter with respect to controlled substances, the Attorney General may subpoena witnesses, compel the attendance and testimony of witnesses, and require the production of any records (including books, papers, documents, and other tangible things which constitute or contain evidence) which the Attorney General finds relevant or material to the investigation.

Clearly the statute expressly grants the Attorney General subpoena power "in any investigation" conducted by him pursuant to his powers and duties under the Comprehensive Drug Abuse Prevention and Control Act of 1970. This statute was intended as a comprehensive federal program to place certain drugs and other substances under strict federal controls to be administered by the Attorney General. The Act provided the Attorney General with broad administrative duties as well as enforcement duties, both criminal and civil. Drugs and various other defined substances were subject to being classified or declassified for various purposes under the Act, manufacturers and distributors were to be registered (which registrations were subject to revocation and suspension), research was to be conducted, inspections of registrants were to be made, public reports were to be made and many other similar duties on a continuing basis were placed under the Attorney General's supervision. In addition, the Attorney General was made the chief enforcement officer for purposes of both the civil and criminal penalties of the law, including enforcement of certain "prohibited acts" set forth in 21 U.S.C. § 841 under which the defendants were indicted.

■ The Attorney General is authorized to delegate any of his functions to any officer or employee of the Department of Justice. Under Reorganization Plan No. 2 of 1973, the Drug Enforcement Agency was established by Presidential order and placed within the Department of Justice. The Attorney General delegated his authority to issue subpoenas to special agents in charge.

28 C.F.R. Subpart R, Appendix § 7(a). The subpoenas that were issued in this case were all either by agents-in-charge or acting agents-in-charge. Thus, if the Attorney General was granted the right by statute to issue subpoenas for purposes of conducting his criminal investigative functions under the Act, the use of such subpoenas in this case was valid.

Defendants make strong and logical arguments, based primarily on historical precedent, to the effect that subpoena power in criminal investigations rests exclusively in the hands of grand juries and courts, and that the statute grants the Attorney General subpoena power only in carrying out his civil administrative duties under the statute. Defendants assert that the executive branch of government has never been given blanket authorization to issue subpoenas to conduct purely criminal investigations.

Defendants cite various cases construing the subpoena power granted to the Internal Revenue Service under the Internal Revenue Code, 26 U.S.C. § 7602. Analogy of those cases with the present is not appropriate because the Internal Revenue Service's power is expressly limited by the statute "for the purpose of ascertaining the correctness of any return making a return where none has been made, determining the liability of any person . . . , or collecting any such liability." These investigative powers are thus limited to computation of civil liabilities and enforcement thereof through civil proceedings. Had the Internal Revenue Code provided that a subpoena might issue for purposes of the Internal Revenue Service conducting "any investigation relating to its functions under the Internal Revenue Code," the cited cases might present strong precedent. The broad sweep of the language conferring subpoena powers on the Attorney General under the Comprehensive Drug Abuse Prevention and Control Act of 1970 suggests that Congress specifically did

not intend to limit these powers to solely civil and administrative investigations. If it had so intended, it could plainly have so stated.

General language from various cited cases does indeed demonstrate that, historically, only grand juries may compel testimony and the production of documents in criminal investigations. *See United States v. LaSalle National Bank*, 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978); *United States v. O'Connor*, 118 F.Supp. 248 (D.Mass.1953). All counsel agree that they have been unable to find any decided case where an administrative agency of the executive branch of the government has been authorized to subpoena witnesses and/or documents in a purely criminal investigation.[1]

The Supreme Court held in *United States v. Minker*, 350 U.S. 179, 76 S.Ct. 281, 100 L.Ed. 185 (1956) that Section 235(a) of the Immigration and Naturalization Act of 1952, 8 U.S.C. § 1225(a) did not empower an immigration officer to subpoena "a citizen who is himself the subject of an investigation directed toward his denaturalization" *id.* at 190, 76 S.Ct. at 288, for the purpose of conducting an investigation to determine whether good cause exists to institute denaturalization proceedings. I agree with defense counsel's contention that 8 U.S.C. § 1225(a) is functionally quite similar to 21 U.S.C. § 876. In *Minker*, however, the Court simply held that a putative defendant to a denaturalization proceeding did not come within the statutory definition of a "witness" who could be subpoenaed by the Immigration Service conducting the investigation. By analogy with the present case, DEA investigators could not have subpoenaed either McCally or Hossbach to give testimony or produce records in their possession.

■ *Minker* does make general reference to a requirement that a statute granting an

---

1. Defendants note correctly in their brief that the Attorney General was granted executive subpoena power in conducting investigations under the Racketeer Influenced Corrupt Organizations Act (RICO), 18 U.S.C. § 1968, but point out RICO's substantial procedural safeguards, none of which are contained in 21 U.S.C. § 876. Both RICO and the Comprehensive Drug Abuse Prevention and Control Act were passed the same year.

executive branch official the power to subpoena witnesses and documents must be clear and unambiguous. However, the *Minker* Court expressly determined that the phrase, "concerning any matter which is material and relevant to the enforcement of this Act and the administration of the Service," unambiguously "encompasses the full range of subjects covered by the statute." *Id.* at 185, 76 S.Ct. at 285. From this, I conclude that the *Minker* Court, if faced with the present case, would have had no difficulty in deciding that 21 U.S.C. § 876 encompasses all investigations conducted under the Comprehensive Drug Abuse Control and Prevention Act of 1970, both civil and criminal. Nowhere does *Minker* suggest that the subpoenas issued to third parties such as the Bell Telephone Company would be invalid simply because DEA was conducting a criminal investigation.

■ No contention has been made that the grant of subpoena power to an executive branch agency to assist such agency in conducting criminal investigations within the agency's statutory duties exceeds constitutional limitations or is beyond the power of Congress. The statute is clear and unambiguous. Even though such grant of power may be broader than that customarily granted to agencies by Congress, the preamble to the statute as to Congressional findings and declarations, 21 U.S.C. § 801, makes clear that it was of grave concern to Congress that there should be effective methods of dealing with illegal drug manufacturing and distribution. Strict construction and careful analysis of the statute may be appropriate, but a court may not usurp the legislative function by taking away from the executive branch powers plainly, unambiguously, lawfully and constitutionally granted by Congress.

The motion to suppress evidence obtained directly and indirectly through the use of subpoenas issued by the DEA pursuant to 21 U.S.C. § 876 will be denied.

## III. THE WARRANTLESS SEARCHES

(a) *The Ford Road Industrial Park location :* The course of the investigation leading to the warrantless search of unit 12 of the Ford Road Industrial Park, rented to Markex, has been set forth in Part I of this opinion. Investigators learned that Markex had purchased suspect quantities of chemicals and laboratory equipment, had rented unit 12 at the Ford Road Industrial Park, the lease being signed by McCally using the name John Mark Williams on behalf of Markex, and that shipments had been received at that location. Some of this information had been obtained through the use of administrative subpoenas of records. Investigators further learned that there had been little activity noted by other tenants, that the unit's mail box was sometimes stuffed and other times empty, that rent payments were in arrears, and that no one had been observed entering or leaving unit 12 for several days prior to the entry by DEA agents.

One day after DEA agents talked to the owner concerning unit 12, the owner advised DEA agents that he was retaking possession of the premises by reason of default in the rental payments due, and because he believed the premises had been vacated. The owner supplied DEA agents with a passkey which they used to gain entrance.

Upon entry and search of the premises, the agents seized extensive business records which were located in a filing cabinet or file box. The rental unit contained sparse office furniture and equipment, including a typewriter, which was later seized and became an important piece of evidence. A still-connected telephone was located in the office. There were also personal belongings suggesting that someone may have been using the premises for living accommodations. In addition, it was during this search that the "Dr. Shock" letter was discovered and seized.

There is no evidence that subsequent to the warrantless search and seizure anyone on behalf of the tenant, Markex, ever returned to the premises.

■ The government contends that its entry was with the express consent of the

landlord who had repossessed the premises. Even so, I do not think that the government was entitled to seize the property without a warrant, since I conclude that the evidence of an abandonment by Markex or its representatives is insubstantial. Business records, contained in filing cabinets and apparently in good order, were seized. The telephone was operable. Mail was, at least until a few days prior to entry, being received at the rental unit. Although there may have been rent in arrears and other valid reasons to terminate the lease and retake possession, no formal notification of termination had been given by either party and no legal proceedings had been instituted to regain possession. State law provides strict procedures for retaking of possession. The landlord does not have the right to personal property left on the premises except by way of distraint for rent. See generally, Landlord and Tenant Act of 1951, 68 P.S. § 250.101 et seq. In the absence of clear proof of abandonment, regardless of the right of the landlord to enter the premises or to permit DEA agents to enter, the landlord had no right to permit DEA agents to seize, without a warrant, the personal property of Markex; nor had the DEA agents such right.

■ The "Dr. Shock" letter may have been found in the trash in the building. Nevertheless, I conclude that absent proof of abandonment of the entire premises, there can be no finding of an abandonment of any of the contents, even those placed in trash containers within the area of the rental unit.

The search of the Ford Road Industrial Park unit 12 by DEA agents, without a warrant, was in excess of the agents' authority. The seizure of property during the warrantless search was likewise in excess of authority. The cases are clear that such evidence may not be used against anyone asserting a properly protectable interest.

Whatever may have been the prior law as to the right of a defendant to challenge illegally seized evidence, the most recent cases of the Supreme Court make it clear that only if one has a legitimate expecta-

tion of privacy as to the evidence seized may he successfully move for suppression at trial. Rawlings v. Kentucky, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); United States v. Salvucci, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); Rakas v. Illinois, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). The "automatic standing" rule of Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960) was expressly overruled in United States v. Salvucci, supra.

■ The government takes the position that since unit 12 was rented in the name of Markex, by McCally using a fictitious name of John Mark Williams, neither defendant is entitled to the benefit of the exclusionary rule. However, it is also the government's position—and a key element of the case against McCally—that Markex is itself a fictitious business entity, and is in reality McCally's own personal operation. Under these circumstances, applying the legitimate expectation of privacy test, I conclude that McCally is entitled to the benefit of the exclusionary rule.

All evidence seized during the warrantless search or searches of unit 12 of the Ford Road Industrial Park will be suppressed at trial as against defendant McCally. Because the evidence does not disclose that Hossbach had any interest in the property at all, and no legitimate expectation of privacy as to its contents, the evidence will not be suppressed as to him.

■ (b) The Ditman Street Apartment: The Ditman Street Apartment had been rented in the name of John Mark Williams by McCally. The landlord thought that the premises could be repossessed for nonpayment of rents due. Neither McCally nor anyone else had been seen entering or leaving the apartment for some time prior to the search, and there is no evidence that McCally ever returned after the search. The only evidence obtained in the search was the telephone number of the functioning telephone in the apartment. This evidence the investigators had already obtained from proper independent sources.

The evidence fails to establish that McCally had abandoned the premises. The search and seizure of evidence was improper. For reasons substantially the same as set forth in the analysis of the search and seizures at unit 12, Ford Road Industrial Park, the evidence obtained during the search of the Ditman Street Apartment will be suppressed as to McCally, but will not be suppressed as to Hossbach.

(c) *The Cherry Hill Locker* search presents a more complex problem. First, the lead through which the locker was located was at least in part the bumper beeper surreptitiously placed on Hossbach's car. Defendants claim that the bumper beeper violated their fourth amendment rights, that use of such a device is illegal, and that the purported authority from the magistrate did not meet the probable cause requirements and findings necessary for a valid search and seizure warrant.

As to whether a bumper beeper requires a warrant, *i. e.*, whether its use without prior judicial authorization violates the fourth amendment, most cases have held that no warrant is necessary. *United States v. Hufford*, 539 F.2d 32 (9th Cir. 1976); *United States v. Clayborne*, 584 F.2d 346, 351 (10th Cir. 1978); *United States v. Bruneau*, 594 F.2d 1190 (8th Cir. 1979); *United States v. Pretzinger*, 542 F.2d 517 (9th Cir. 1976). *Contra, United States v. Holmes*, 521 F.2d 859 (5th Cir. 1975).

■ Here, however, because a warrant was in fact obtained, it is not necessary to decide the issues of whether a warrant or authorization is required, and if so, whether exclusion of evidence is a proper sanction. The DEA investigators obtained judicial authorization from Magistrate Hall, after submitting to him an application, properly verified by affidavit, showing probable cause to believe that the car was being used by McCally for illegal drug operations. Defendants seem to take the position that because there is no express statute for a warrant to place a bumper beeper on a suspect's car and because Magistrate Hall did not expressly state in his order that he found probable cause to believe that the car was being used illegally, the authorizations must be held invalid. I do not agree. Magistrate Hall expressly found "probable cause" to issue the order of authorization. It is clear that probable cause did in fact exist. The use of the bumper beeper was properly authorized and its use was within the confines of the authorization.

■ As to the Cherry Hill locker storage space, there is clear and convincing evidence of abandonment or, at least, a surrender of any legitimate expectation of privacy which either defendant may ever have had as to the contents of the locker. This is so even though the entry was obtained prior to the termination of the lease.

Examination of the video tape prior to the agents' entry revealed that two men, tentatively identified as McCally and Hossbach, removed many items from the locker and placed them in a rental truck and drove away, leaving the door to the premises ajar. A separate padlock had been unlocked by McCally to gain entrance, and when the two defendants left the premises, the padlock was taken by McCally. Several days later, the key to the lock supplied by the landlord as part of the rental was returned by mail from Ohio. Moreover, the remaining items seized by the agents appeared to be broken or miscellaneous cartons of chemicals, pieces of equipment and trash, all strewn about in some disarray.

These circumstances clearly manifest an abandonment of any claim to the property by the defendants. I believe, however, that under the most recent cases of *Salvucci* and *Rawlings, supra*, the proper test is whether either defendant held a legitimate expectation of privacy as to the articles seized. Having left them at a public rental warehouse, with the door open and the contents in plain view to others who might happen by, and having later returned the key with no request to secure the remaining contents, defendants have manifested—and it has been established by clear and convincing evidence before the court—the lack of any legitimate expectation of privacy in the property seized.

The motion to suppress the evidence obtained from the Cherry Hill rental unit 394 will be denied.

## IV. HOSSBACH'S GRANT OF IMMUNITY

Count 1 of the indictment charges these defendants with conspiracy to manufacture and distribute illegal drugs from about November 24, 1976 until April 17, 1980. During 1977, Hossbach testified under a formal statutory grant of immunity before a grand jury and at the trial in *United States v. Bailey*, Crim. No. 77–303, in the Eastern District of Pennsylvania. In addition, Hossbach provided Philadelphia DEA agents extensive interviews, under an informal grant of immunity, concerning his knowledge of nationwide illegal drug activities. These interviews included between 50 and 100 hours with agent Hershowitz of the Philadelphia DEA office.

The record is clear that there was at least one direct use of Hossbach's immunized testimony or immunized statements in obtaining evidence in this case. On or about April 16, 1980, the Government obtained a warrant from Magistrate Leomporra authorizing a search at 662 Swamp Road, Doylestown Township, Furlong, Pennsylvania. According to the affidavit in support of the search warrant, the Government believed that Hossbach resided at that address with his "paramour," Jann Alexander. Paragraph 44 of the affidavit makes explicit reference to Hossbach's testimony in the *Bailey* case:

I have personal knowledge that Raymond A. Hossbach keeps financial records relating to his manufacture and sale of Schedule II Non-Narcotic Drugs. I have personally examined a blue notebook previously kept by Hossbach in which he recorded his manufacture and sale of Schedule II drugs. In *United States v. James Bailey*, Criminal No. 77–303 (E.D. Pa.), Hossbach specifically identified the book described above and testified that he used it to record his Schedule II drug activities. Furthermore, S/A Ellis Hershowitz, DEA, the case agent in the

*James Bailey* case, has informed me that Hossbach routinely keeps financial records pertaining to his manufacturing and sales activities of Schedule II drugs.

The government contends that the grant of immunity does not protect a witness from prosecution for crimes committed subsequent to the time when the immunized testimony was given. The government seeks support from *United States v. Quatermain*, 613 F.2d 38 (1980). The *Quatermain* Court, while recognizing that the privilege against self-incrimination ordinarily applies only to prohibit testimony concerning crimes committed prior to the grant of immunity, *id.* at 42, noted that there are exceptions where there is a real and substantial possibility that testimony will incriminate as to prospective acts. *United States v. Freed*, 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971). A "chronological formula" was expressly rejected in *Marchetti v. United States*, 390 U.S. 39, 54, 88 S.Ct. 697, 705, 19 L.Ed.2d 889 (1968):

[A]lthough prospective acts will doubtless ordinarily involve only speculative and insubstantial risks of incrimination, this will scarcely always prove true.... it is not mere time to which the law must look, but the substantiality of the risks of incrimination.

If a crime committed by a witness after testifying under a grant of immunity is wholly unrelated to that about which the witness testified, derivative use of immunized testimony would probably be appropriate. *Quatermain, supra. Desimone v. United States*, 423 F.2d 576, 581–82 (2d Cir.), *cert. denied*, 400 U.S. 842, 91 S.Ct. 84, 27 L.Ed.2d 77 (1970); *Varitimos v. United States*, 404 F.2d 1030, 1034 (1st Cir. 1968), *cert. denied*, 395 U.S. 976, 89 S.Ct. 2126, 23 L.Ed.2d 765 (1969).

It is unnecessary in this case to decide when and to what extent immunized testimony may be used to convict a witness of a subsequent unrelated crime, inasmuch as Hossbach's immunized testimony does indeed appear to be related to the present charges. It was in 1977 that Hossbach was granted immunity and testified concerning

an illegal drug conspiracy. The present indictment charges that during this same time period Hossbach and McCally were actively engaged in a similar ongoing illegal drug conspiracy. The *Bailey* indictment named Hossbach as an unindicted co-conspirator. Moreover, in the *Bailey* indictment as in the present one, the recitation of overt acts states that one of the suppliers of equipment to the conspirators was the Arthur K. Thomas Company of Philadelphia.

Clearly, this is not one of those situations where the crime charged was prospective and speculative at the time the immunized testimony was given. I conclude that the two courses of criminal activity—the one subject to a grant of immunity, and the other charged in the present indictment— are sufficiently interrelated that the grant of immunity extends to both. Thus, because the search warrant for the residence at 662 Swamp Road was directly premised upon the improper use of immunized testimony, all evidence obtained as a result thereof must be suppressed.

This however does not end the inquiry into the use of Hossbach's immunized testimony, since the immunity statute, 18 U.S.C. § 6002, prohibits not only the direct use of such testimony, but also the use of information indirectly derived therefrom.

The United States Supreme Court has held that where a defendant has formerly testified under a grant of immunity, it is up to the government to show that the evidence it proposes to use is not derived, either directly or indirectly, from the immunized testimony. *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). The government's burden, the Court stated at page 460, 92 S.Ct. at page 1665, "is not limited to a negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." As to the procedure for determining whether evidence is tainted, the Court unambiguously held that: "One raising a claim under this statute need only show that he testified under a grant of

immunity in order to shift to the government the *heavy burden* of proving that *all of the evidence* it proposes to use was derived from legitimate independent sources." *Id.* at 461–62, 92 S.Ct. at 1665 (emphasis added). I conclude, notwithstanding the *Quatermain* case and the government's reliance thereon, that the *Kastigar* rule must be applied in this case.

The government contends, however, that even if the *Kastigar* rule is deemed controlling here, it has met its burden thereunder, primarily through the testimony of the case agent Donn Jerre Miller. Mr. Miller's testimony consisted of relating chronologically his investigation of the case (as partially summarized in Part I of this opinion). His affidavit for the arrest warrants also sets forth most of the salient history of his investigation. In addition, Mr. Miller testified that he personally took no part in the *Bailey* investigation or prosecution, never interviewed Hossbach in connection with that case and never read or reviewed any of Hossbach's immunized testimony or statements. A fair interpretation of his testimony is also that so far as he knows, none of the other agents on the case ever had any knowledge of the immunized testimony.

The government deemed it unnecessary to present more thorough evidence than this, having taken the position that even if the *Kastigar* rule did apply, it should not be so broadly construed as to afford the defendants a full discovery trial to which they would not otherwise be entitled. I cannot agree. *Kastigar* is quite unambiguous about the heavy burden that the government must bear. Moreover, I share Justice Marshall's grave concern, expressed in his dissent in *Kastigar,* that the rule adopted by the majority might leave a witness dependent for the preservation of his rights upon the good faith of the prosecuting authorities, and that even prosecutors acting in the best of faith cannot be certain that there would not be some prohibited use of compelled testimony. *Id.* at 469, 92 S.Ct. at 1669.

Probably the only way the government could ever meet its "heavy burden" and

overcome the legitimate concerns of Justice Marshall would be to present at a pretrial hearing all of the testimony and evidence it proposes to present at trial. The trial judge would then be required to make specific findings of fact and conclusions of law as to taint and, in effect, by a full nonjury "pretrial trial" purge the record to be developed before the jury at trial.

By this standard, the government's proof is clearly inadequate. There has been no detailing of all of the evidence to be produced. All witnesses who may be called at trial have not been subject to examination by defense counsel as to their possible utilization of Hossbach's immunized statements. Significantly, this is not a case where immunized testimony was given only before a grand jury sworn to secrecy; Hossbach testified at the public trial of Bailey, and his testimony was available to the public and subject to news media coverage.

■ The government in its brief concedes, as it must, that Hossbach's immunized testimony was directly utilized to obtain the 622 Swamp Road search warrant. The government's brief then asserts that "the only other alleged use of immunized testimony" was the identification of Hossbach as a possible co-conspirator. By this argument, the government misconstrues its obligation. The defense need not allege or show that in fact any evidence was derived directly or indirectly from the immunized testimony. Defense need only show that testimony was in fact given under the grant of immunity. This is enough to trigger the *Kastigar* requirement that the government show that all of its evidence was derived from legitimate independent sources.

Even if it were theoretically possible to establish by the testimony of one case agent that all of the evidence came from legitimate independent sources, it is clear in this case that no such showing has been made. I find this conclusion inescapable regardless of whether the term "heavy burden" is construed to require proof by clear and convincing evidence—which seems to me most logical—or by a mere preponderance of the evidence, or by some other standard.

Agent Miller's testimony is most noticeably unpersuasive on the critical issue of whether Hossbach's initial identification as a suspect in this case was the result of the use of immunized testimony. Although that identification might possibly have been developed entirely independently from Agent Miller's conversation with Agent Hershowitz concerning the Dr. Shock letter, it is far more likely that their conversation was a vital lead. Even if only confirmatory of Agent Miller's suspicions, the conversation was important in the continuing investigation and surveillance of Hossbach. As the *Kastigar* Court states at page 460, 92 S.Ct. at page 1664 (footnote omitted):

> This total prohibition on use provides a comprehensive safeguard, barring use of compelled testimony as an "investigatory lead," and also barring the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures.

■ The government's proof is deficient in other respects as well. Although Agent Miller testified that he had never read or utilized the Hossbach interviews or testimony, there is no evidence that the other agents involved in the investigation similarly abstained. Clearly such materials were available to any of the DEA agents in the Philadelphia office. There was no effort to segregate the agents investigating this case from those working on other cases. It was not shown that any agents were cautioned against freely discussing with one another the Hossbach immunized testimony and statements. To the contrary, the evidence is clear that there were constant exchanges of information within the DEA office among various agents, which of course would be proper and normal in most investigations. Agent Hershowitz, who had been involved in the *Bailey* investigation, not only knew of the investigation in this case but, as noted, discussed the Dr. Shock letter and its possible implications with Agent Miller. Moreover, Agent Miller was aware that Hossbach had testified and cooperated with DEA agents under a grant of immunity.

The initial report of the sale of chemicals to Markex given to New York DEA agents has not been shown to have been free from taint. There is no evidence that Agent Caputo or other New York DEA agents did not rely on any of Hossbach's immunized testimony in deciding to report the sale to Philadelphia. Certain of the same chemical and laboratory supply businesses were involved in both the *Bailey* case and the present case. There is no way of knowing whether any information provided by such business enterprises to investigating officials was based on any information given by Hossbach under his grant of immunity at the *Bailey* trial. The government proposes to present evidence as to other persons involved in the conspiracy—evidence that developed from leads obtained from third persons who likewise may have had some knowledge or information gleaned from Hossbach's immunized testimony.

No doubt the government may consider all these concerns to be pure speculation. However, it must be emphasized that it is the government's heavy burden to prove the negative in this case; *i. e.,* that none of its evidence suffers from taint. The government might find this to be an unreasonable or impossible burden. The government must however recognize that it, in its sole discretion, determines to whom it will grant immunity in order to convict others. The government must recognize that where it grants immunity, it runs the grave risk that any future prosecution of such an immunized witness for past or continuing crimes may, as a practical matter, be impossible, irrespective of whether the prosecutors who grant such immunity know or have any reason to know or suspect the witness of such other crime or crimes.

*Kastigar* lays down a firm rule that requires a trial court to be sure that no evidence derived from immunized testimony will be presented to a jury. Justice Marshall, in dissent, opined that the majority rule presented an "intolerably great risk" that tainted evidence would nonetheless slip through the loose net set out by the Court to trap tainted evidence. 406 U.S. at 469, 92 S.Ct. at 1669. The government has failed to meet its burden of proof as to any and all of the evidence against Hossbach. Because the original investigation and leads as to Hossbach have not been shown to be absolutely free from any use or derivative use of Hossbach's immunized testimony, all evidence against him must be suppressed.

Since all evidence will be suppressed as to Hossbach, dismissal of the indictment as to him might be appropriate at this stage. However, at this point, I think it appropriate merely to suppress the evidence.