**UNITED STATES of America, Appellee,**

v.

**Robert SKALSKY, Appellant.**

**No. 87–5140.**

United States Court of Appeals,
Third Circuit.

Argued Sept. 14, 1987.

Decided Sept. 13, 1988.

Gregory T. Magarity (argued), Nancy O. Ezold, Anthony R. Twardowski, Wolf, Block, Schorr and Solis–Cohen, Philadelphia, Pa., for appellant.

Samuel A. Alito, Jr., U.S. Atty., Edna Ball Axelrod (argued), Asst. U.S. Atty., Newark, N.J., for appellee.

Before BECKER and SCIRICA, Circuit Judges, and FARNAN, District Judge *.

## OPINION OF THE COURT

FARNAN, District Judge.

The appellant, Robert Skalsky, was convicted in the United States District Court for the District of New Jersey on charges of willfully and knowingly attempting to evade and defeat the payment of income taxes for the years 1978, 1979, and 1984. Skalsky maintains on appeal that his conviction should be set aside pursuant to an immunity agreement entered into by him and the government. The district court determined that Skalsky had entered into a nonprosecution agreement and he materially breached the agreement and, therefore, was subject to prosecution. Because we agree with the district court's legal interpretation of the agreement and because we find the court's finding that Skalsky breached that agreement is not clearly erroneous, *United States v. Delerme*, 457 F.2d 156, 160 (3d Cir.1972), the judgment of conviction will be affirmed.

## FACTS

The series of events culminating in this appeal can be summarized as follows. The Internal Revenue Service, in November, 1979, initiated an investigation of Emmanuel Gambino to determine if Gambino had violated federal tax laws by failing to file tax returns or by understating his taxable income. In 1980, Skalsky was subpoenaed to appear before the Gambino Grand Jury. On April 15, 1980, Skalsky went to the Federal Courthouse in Camden, New Jersey, accompanied by his attorney, Michael K. Simon, who is also Skalsky's son-in-law. Simon had no previous experience as a criminal lawyer. Skalsky informed United States Special Attorney George E. Wilson that he intended to invoke the Fifth Amendment if called to testify before the grand jury. The government, after informing Skalsky that he was not a target of the Gambino investigation, entered into a written agreement with Skalsky in order to obtain his testimony before the grand jury and overcome his assertion of his right against self-incrimination. Simon participated in the drafting of this agreement, which promised, *inter alia*, that, subject to certain conditions concerning Skalsy's cooperation, "the United States will not prosecute Mr. Skalsky for potential charges based upon information supplied to this office by him. Such immunity specifically includes charges related to his activities in dealing with Emmanuel Gambino." At Simon's suggestion, the agreement also included the following provision: "It is also understood that on Constitutional grounds, any testimony given pursuant to this

---

* Honorable Joseph J. Farnan, Jr., United States District Judge for the District of Delaware, sitting by designation.

agreement is tainted for use by any other prosecuting office." [1]

Pursuant to the executed letter agreement, Skalsky was questioned by I.R.S. Agents Paul Gould and Donald Pisker concerning various business ventures with Gambino, including an attempt by Skalsky and Gambino to buy the Shelbourne Hotel in Atlantic City, New Jersey. There is some dispute as to exactly what Skalsky told the I.R.S. agents regarding the Shelbourne deal; however, under either party's account, it is clear that Skalsky did not tell the agents that he and Gambino received $250,000 as settlement proceeds from a lawsuit involving their option to buy the hotel.

After completion of the I.R.S. questioning, Skalsky was questioned before the Gambino Grand Jury by Wilson. The record indicates that Wilson directed one open-ended question concerning the Shelbourne Hotel to Skalsky and that Skalsky again failed to mention the $250,000 settlement.

Subsequent to Skalsky's testifying, the government learned of the settlement proceeds and notified Skalsky in July of 1981 that he had breached the letter agreement by failing to give "complete, truthful and accurate" information to the I.R.S. agents and to the Gambino Grand Jury. In April, 1985, Skalsky was indicted on three counts of income tax evasion.[2]

1. The agreement between Skalsky and the government provided as follows:

> Michael K. Simon, Esquire
> Suite 700, 1315 Walnut Street
> Philadelphia, Pennsylvania 19107
> Re: Robert Skalsky
> Dear Mr. Simon:
> On the understandings specified below, the United States will not prosecute Mr. Skalsky for potential charges based upon information supplied to this office by him. Such immunity specifically includes charges related to his activities in dealing with Emmanuel Gambino. This agreement is expressly conditioned on this office's knowledge of all activities and possible wrongdoing on Mr. Skalsky's part in connection with Emmanuel Gambino and his representation through you that no other such wrongdoing exists.
> The understandings are that Mr. Skalsky shall truthfully disclose all information with respect to the activities of himself and others concerning all matters about which this office inquires of him, and further, shall truthfully testify before the Grand Jury and/or at any trial or other court proceeding with respect to any matters about which this office may request his testimony.
> It is further understood that this agreement is limited to the District of New Jersey, and cannot bind other federal, state, or local prosecuting authorities, although this office will bring the cooperation of Mr. Skalsky to the attention of other prosecuting offices, if requested. If any other prosecuting office should commence an investigation of Mr. Skalsky for the possible wrongdoing referred to in this letter, we will recommend to such other prosecuting agency that it adopt the terms of this letter. It is also understood that on Constitutional grounds, any testimony given pursuant to this agreement is tainted for use by any other prosecuting office.
> It is further understood that Mr. Skalsky must at all times give complete, truthful and accurate information and testimony. Should it be judged by this office that Mr. Skalsky has given false, incomplete or misleading testimony or information, or has otherwise violated any provision of this agreement, this agreement shall be null and void and he shall thereafter be subject to prosecution in this and any other prosecuting office for any federal criminal violation of which this office has knowledge, including, but not limited to, perjury and obstruction of justice. Any such prosecutions may be premised upon any information provided by Mr. Skalsky and such information may be used against him.
> Finally, it is expressly understood that the fact of this agreement is not to be construed as a legal or factual determination by this office that Mr. Skalsky has violated any federal law. This understanding has been entered into solely to facilitate this office's investigation and to clarify Mr. Skalsky's status as a witness.
> No additional promises, agreements and conditions have been entered into other than those set forth in this letter and none will be entered into unless in writing and signed by all parties.
> > Very truly yours,
> > George E. Wilson
> > GEORGE E. WILSON
> > Special Attorney
> AGREED AND CONSENTED TO:
> *Robert Skalsky*
> ROBERT SKALSKY
> *Michael K. Simon*
> MICHAEL K. SIMON, ESQ.
> Attorney for Robert Skalsky

2. The Grand Jury returned a Superseding Indictment on November 6, 1985, which added a fourth count of income tax evasion for the year 1984.

Prior to trial in the district court, Skalsky moved to dismiss the indictment on the ground that the criminal prosecution was in violation of the immunity agreement he had with the government. The district court found that, contrary to Skalsky's contentions, the agreement did not grant him use and derivative use immunity, but instead extended to Skalsky the more limited protection of an agreement not to prosecute, conditioned on Skalsky's promise to give "complete, truthful and accurate information." *United States v. Skalsky*, 616 F.Supp. 676, 680 (D.N.J.1985). Additionally, the district court opined that Skalsky "willingly and with the advice and consent and participation of counsel entered into a *contract* ... which, if breached, would expose him to prosecution...." *Id.*

The district court then held an evidentiary hearing to determine if Skalsky had materially breached his agreement with the government. *Id.* at 682. After presentation of witnesses and exhibits, the court found by clear and convincing evidence that Skalsky and Gambino had received $250,000 in settlement of their lawsuit involving the Shelbourne Hotel option. *United States v. Skalsky*, 621 F.Supp. 528, 531 (D.N.J.1985). The court also found that Skalsky's failure to inform the government of the $250,000 settlement constituted a material breach of his agreement with the government. *Id.* In the district court's view, the agreement not to prosecute required Skalsky to give complete answers, not narrowly or evasively framed answers. *Id.* at 531–32. Based on these findings, the district court denied Skalsky's motion to dismiss the indictment. *Id.* at 533. Skalsky was subsequently convicted of willfully and knowingly attempting to evade and defeat income tax payment for 1978, 1979, and 1984.

## DISCUSSION

Appellant Skalsky contends that the district court's rulings were clearly erroneous. He argues in the first instance that "the clear language utilized by the government in drafting the agreement ... compels the conclusion that the agreement was ... a full grant of use and derivative use immunity coextensive to a formal grant of immunity pursuant to 18 U.S.C. § 6001–6003." Appellant's Opening Brief at 16–17, *United States v. Skalsky*, No. 87–5040. Title 18, U.S.C. § 6002 provides in relevant part:

Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding before or ancillary to (1) a court or a grand jury of the United States, ... and the person presiding over the proceeding communicates to the witness an order issued under this part, the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order.

Although 18 U.S.C. § 6002 sets forth the procedure for granting a witness formal immunity, the Department of Justice and the federal courts have consistently approved the use of "informal immunity" agreements. *See generally United States v. Quatermain*, 613 F.2d 38, 41 (3d Cir.) (government may properly enter informal immunity agreements with grand jury witnesses), *cert. denied*, 446 U.S. 954, 100 S.Ct. 2923, 64 L.Ed.2d 812 (1980); *United States Attorney's Manual*, Title 9—Criminal Division, at 37 (1984) (government attorney may, with supervisory approval, enter nonprosecution agreement in exchange for a person's cooperation). Informal grants of immunity can be divided into two forms—informal letter immunity and agreements not to prosecute. The most significant difference between these two forms of agreement is that, pursuant to informal letter immunity, a witness' sworn grand jury testimony cannot be used to prosecute the witness for any substantive offenses included within the scope of his testimony. Thus, a grand jury witness who testifies falsely under a grant of informal letter immunity can only be charged

with perjury or obstruction of justice. *See generally United States v. Black*, 776 F.2d 1321, 1326 (6th Cir.1985).

On the other hand, an agreement not to prosecute generally affords a witness more limited protection. The most common type of an agreement not to prosecute is one in which the government promises not to prosecute an individual for any matters about which he testifies, provided the witness testifies truthfully and completely. *See e.g., United States v. Girdner*, 773 F.2d 257, 259 (10th Cir.1985), *cert. denied*, 475 U.S. 1066, 106 S.Ct. 1379, 89 L.Ed.2d 605 (1986). If a witness breaches the agreement by not providing truthful testimony, the witness can be prosecuted not only for perjury and obstruction of justice, but also for any substantive offenses about which he has testified. *See United States v. Irvine*, 756 F.2d 708, 710–12 (9th Cir. 1985) (witness who breached agreement not to prosecute could be prosecuted for narcotics offenses based on his grand jury testimony).

■ Based on our reading of the entire agreement in this case, not just the selective excerpts that Skalsky emphasizes on appeal, we conclude that the district court accurately found that Skalsky and the government entered into an agreement not to prosecute. *See United States v. Irvine*, 756 F.2d at 710 (language of cooperation agreement must be read as a whole and given reasonable interpretation). The very first sentence of the letter summarizes the contract between the parties: "On the understandings specified below, the United States will not prosecute Mr. Skalsky for potential charges based upon information supplied to this office by him." In exchange for the government's promise of nonprosecution, Skalsky promised to "at all times give complete, truthful and accurate information and testimony." In addition to detailing the obligations of each party, the agreement further provided that if Skalsky failed to comply with the provisions of the

agreement, the agreement would be "null and void" and Skalsky could "*be subject to prosecution* in this and any other prosecuting office *for any criminal violation ... including, but not limited to,* perjury and obstruction of justice." (Emphasis added.) Finally, the agreement provided that in the event of a breach, information provided by Skalsky could be used against him for prosecution of federal criminal offenses. In short, Skalsky and the government entered into an agreement that specifically described the duties of each party and the effect of the agreement's provisions in the event of a breach.

We agree with Skalsky that there is some tension in the language of the agreement. The reference to "immunity" in the second sentence of the letter, combined with the promise that "on Constitutional grounds, any testimony given pursuant to this agreement is tainted," could understandably lead a lay reader, who has attempted to invoke his fifth amendment rights, to believe that the letter grants a form of constitutional immunity from prosecution. Therefore, had Skalsky been uncounseled, we might have been presented with a more difficult case. Skalsky, however, had counsel present and counsel was actively involved in the drafting of the agreement. Therefore, the aforementioned references do not alter our conclusion. The other terms of the agreement demonstrate clearly that it was not an agreement providing use or derivative use immunity. It was merely an agreement not to prosecute Skalsky based upon information provided by him to the government in accordance with the terms of the agreement.

Skalsky relies on *United States v. Quatermain*, 467 F.Supp. 782 (E.D.Pa.1979), *rev'd*, 613 F.2d 38 (3d Cir.), *cert. denied*, 446 U.S. 954, 100 S.Ct. 2923, 64 L.Ed.2d 812 (1980), to support his contention that the government conferred use and derivative use immunity in the April 15, 1980 letter.[3]

---

**3.** It is interesting to note that, before the district court, Skalsky argued that the government provided him with transactional immunity. *Skal-*

*sky*, 616 F.Supp. at 679. As an alternative position, Skalsky asserted in the district court that he was entitled to use and derivative use immu-

The decision in *Quatermain,* however, is factually distinguishable from the instant case. Under the agreement in *Quatermain,* the defendant promised to cooperate and testify and the government promised "immunity from prosecution for your participation and involvement with Zelman A. Fairorth and others relating to the manufacture of methamphetamine." *Id.* at 787. The district court found the agreement was "not unambiguous on its face" and, therefore, examined the factual context in which the agreement was reached. *Id.* In concluding that the defendant was entitled to the "minimum constitutional requirement" of use and derivative use immunity, the district court relied on the ambiguity of the agreement, the government's characterization of the agreement as one for "use immunity," the government's sole reliance on the language of the agreement, and the fact that the defendant negotiated the agreement without the assistance of counsel. *Id.* at 788. This court, in reversing the district court's order suppressing the trial testimony of a government witness, "assume[d], without deciding, that the district court correctly found that the informal agreement conferred the minimum immunity required by the Constitution ..." 613 F.2d at 41.

Unlike the situation in *Quatermain,* Skalsky entered the agreement with the assistance of counsel who clearly understood the nature of the agreement and, in fact, negotiated to have a term favorable to his client added to the agreement.[4] Under the circumstances, we conclude the district court properly found Skalsky knowingly and voluntarily entered into a nonprosecution agreement with the government.

Although we have concluded that Skalsky received what he bargained for, we question the government's use of non-pros-

ecution agreements in cases where the defendant has asserted his fifth amendment privilege. This is not to say that such agreements may not have their place in the government's dealings with persons who are purportedly not potential defendants, but we believe their use in response to an assertion of the fifth amendment privilege is troublesome. Although it may be less expeditious, the government might consider providing at the minimum letter immunity and certainly consider granting statutory immunity under § 6001 *et seq.* to such witnesses once they have asserted their fifth amendment claim. Such a practice should avoid disputes such as here and in *Quatermain* and, moreover, would provide a greater degree of specificity and fairness to the government's negotiations with both non-culpable witnesses and witnesses who may have culpability and, therefore, are potential defendants. *See Quatermain,* 613 F.2d at 46 (Aldisert, J., dissenting) ("a clearer understanding of the bargain than that presented by the facts of this case should be the *sine qua non* of any such undertaking. Conditions describing the extent of nonprosecution should be set forth with maximum specificity").

■ In short, it would seem that when a witness, whether a potential defendant or not, asserts his fifth amendment privilege, the sounder and more congruent course for the government would be to respond to the fifth amendment claim with either letter or statutory immunity. The government, in such situations, might avoid the use of agreements which by their characterization as "non-prosecution" may give a witness or a potential defendant the impression that he received more from such an agreement than he actually did. Absent a modification of the government's current practices, the courts may often be obliged to interpret such non-prosecution agreements

nity pursuant to 18 U.S.C. §§ 6001–6003. 616 F.Supp. at 679. On appeal, Skalsky has apparently abandoned the argument that the government agreed to grant him transactional immunity under the terms of the agreement.

4. At Simon's insistence, the following term was added to the agreement: "It is also understood that on Constitutional grounds, any testimony given pursuant to this agreement is tainted for use by any other prosecuting office."

against the government.[5] At the very least, the government would be well advised to consider developing more rational, consistent procedures than the record in this case reflects.

█ We now address the second issue presented by this appeal which concerns the district court's finding that Skalsky materially breached his nonprosecution agreement with the government by giving false, incomplete, or misleading information in his interview with I.R.S. agents and in his testimony before the Gambino Grand Jury.

Skalsky does not dispute the fact that he and Emmanuel Gambino received $250,000 in settlement of a suit to enforce their option to purchase the Shelbourne Hotel in Atlantic City, New Jersey. During the interview by I.R.S. Agents Gould and Pisker on April 15, 1980, Skalsky was questioned about his business dealings with Gambino, including those involving the Shelbourne Hotel. According to Agent Gould's summary of the interview, Skalsky stated that his option with Gambino to purchase the Shelbourne Hotel "never materialized." Skalsky maintains that he told the I.R.S. agents that he and Gambino had filed a *lis pendens* to enforce their option to buy the Shelbourne Hotel but never told the agents that the suit had settled for $250,000.

After the interview was completed, Skalsky testified before the grand jury. Special Attorney Wilson, already familiar with the substance of Skalsky's interview with the I.R.S. agents, asked Skalsky the open-ended question about the Shelbourne Hotel. Skalsky responded as follows:

"Wilson: How about the Shelburne Hotel, Shackny's, S–H–A–C–K–N–Y–S? Skalsky: I told Mr. Gould about Shackny's that we tried to purchase it and

there was an agreement but it was never signed by the seller."

Skalsky now contends that his failure to divulge the information about the $250,000 settlement of the Shelbourne Hotel to the I.R.S. agents and the grand jury cannot be considered a breach of his agreement with the government. Under Skalsky's interpretation of the agreement, he was not obliged to volunteer information; he was required only to respond to specific questions asked of him. Skalsky's position is simply untenable.

The terms of the agreement indicate that the government expected Skalsky to completely disclose all information concerning "all [of his] activities ... in connection with Emmanuel Gambino." Skalsky was aware from the signed agreement that the purpose of the grand jury investigation was to identify sources of Mr. Gambino's income. Moreover, the agents' questions, though perhaps not precisely framed, made plain what information they were seeking. Skalsky was asked specifically about the Shelbourne Hotel deal (and much time was spent discussing that deal), yet Skalsky threw the agents off the scent by giving affirmatively misleading answers. We cannot agree with Skalsky that he complied with his obligation to "give complete, truthful and accurate information and testimony," when he told the agents that "the options never materialized" and that a *lis pendens* had been filed, when in fact litigation over those options produced a $250,000 settlement for Skalsky and Gambino. In short, Skalsky provided information that was incomplete, inaccurate in context, and "affirmatively misleading", *Skalsky*, 621 F.Supp. at 532, and a far cry from the "complete, truthful and accurate information and testimony" contemplated by his agreement with the government.

---

5. Such a practice would be consistent with the policies of the United States Department of Justice as stated in the United States Attorney's Manual:

Finally, there may be cases in which it is impossible or impractical to employ the methods described above to secure the necessary

information or other assistance, and in which *the person is willing to cooperate only in return for an agreement that he/she will not be prosecuted at all* for what he/she has done.... (emphasis added)

*United States Attorney's Manual,* Title 9, Chapter 27, p. 38 (June 15, 1984).

Based on this record, we conclude that the grand jury's investigation of Emmanuel Gambino was severely hampered by Skalsky's incomplete and evasive testimony. *See United States v. Crocker,* 568 F.2d 1049, 1057 (3d Cir.1977) (false testimony is material if it tends to impede the grand jury's inquiry); *United States v. Lardieri,* 497 F.2d 317, 319 (3d Cir.) (perjurious statement is material under federal perjury statute, 18 U.S.C. § 1621, if it has a tendency to influence, impede, or hamper the grand jury's investigation), *on rehearing,* 506 F.2d 319 (3d Cir.1974). We therefore find the district court's finding that Skalsky materially breached his non-prosecution agreement with the government was not clearly erroneous.[6]

For these reasons discussed, we will affirm the district court's judgment of conviction.[7]

---

**6.** In this case, we find that the breach was material because the government was actually hampered in its investigation by Skalsky's evasiveness which was implicitly found by the district court.

---

**7.** Skalsky also contends that the district court erred when it failed to dismiss the indictment for alleged violations of Fed.R.Crim.P. 6(e). We find that any violations of grand jury secrecy that may have occurred did not prejudice Skalsky and hence are not grounds for reversal.