**UNITED STATES of America, Plaintiff,**

v.

**Leonard PELULLO and Raul Corona, Defendants.**

**Criminal No. 94–276 (DRD).**

United States District Court, D. New Jersey.

Oct. 18, 1995.

---

Faith S. Hochberg, United States Attorney by Mark W. Rufolo, Mark Costello, Lewis S. Borinsky, Assistant U.S. Attorneys, Newark, New Jersey, for Plaintiff.

David W. Fassett, Arseneault, Donohue, Sorrentino & Fassett, Chatham, New Jersey, Stand–By Counsel for Pro Se Defendant Leonard Pelullo.

Paul B. Brickfield, River Edge, New Jersey, for Defendant Raul Corona.

## *OPINION*

DEBEVOISE, Senior District Judge.

There are presently pending a motion of defendant Raul Corona for an order (1) dis-missing the indictment, (2) directing that a *Kastigar* hearing be conducted and (3) excluding certain documents from evidence based on the attorney-client privilege, and a motion of defendant Leonard Pelullo for an order dismissing the indictment for the reason that the government seized and made use of documents protected by the attorney-client privilege or for alternative relief.

For the reasons set forth below, Corona's motion to dismiss the indictment against him will be granted; Pelullo's motion to dismiss the indictment against him and for alternative relief will be denied.

### *Background*

In June 1994, a federal grand jury sitting in Newark returned a 53–count indictment charging Corona with various violations of federal law, namely, conspiracy, employee benefit pension plan embezzlement and money laundering. In December 1994, the same grand jury returned the subject 54–count superseding indictment against Corona and Pelullo. Essentially, that indictment charges that between May 1989 and March 1991 Corona and Pelullo conspired with David Hellhake and others to embezzle $4.176 million from two employee pension benefit plans at Compton Press, Inc. ("Compton") by lending $1.15 million to Granada Investment, Inc. ("Granada") and $1.326 million to Away to Travel South, Inc. ("ATTS") and by converting $1.7 million held in an annuity contract with Union Mutual Life Insurance, Co. ("UNUM").

In the Fall of 1991, the United States Attorney's Office for the Middle District of Florida, the United States Attorney's Office for the District of New Jersey, and the Florida Office of Statewide Prosecutions were conducting investigations focusing on Pelullo and various companies operated or controlled by him.

By subpoena dated August 16, 1991, Corona was subpoenaed to appear before a federal grand jury sitting in Jacksonville, Florida. The subpoena commanded Corona's appearance before a grand jury in the Middle District of Florida on September 26, 1991.

On October 17, 1991, Corona met with Assistant United States Attorney ("AUSA") Kathleen A. O'Malley and two agents participating in the Middle District of Florida's investigation into Pelullo, one of whom was Special Agent Martin Wood.

Corona did not have an attorney at that time. He was given a letter of immunity by the United States Attorney's Office for the Middle District of Florida. This letter advised Corona that he was subpoenaed in connection with "an investigation concerning allegations of bankruptcy fraud and related offenses by Leonard Pelullo and others." The letter went on to state that:

> This letter will confirm that your status before the Grand Jury is that of a witness, and that no statement, testimony or other information or any information directly or indirectly derived from such statement, testimony or information, made by you while testifying or during interviews by investigative agents or the United States Attorney's Office, *may be used against you in any criminal case, except in a prosecution for perjury or giving a false statement.* The "use of immunity" just explained is contingent upon you providing complete and truthful information and testimony at all times. (Emphasis added).

This letter did not limit the agreement to the matters being investigated by the United States Attorney for the Middle District of Florida and contained no similar "reservation" clauses.

After receiving the "use immunity," Corona was debriefed by AUSA O'Malley as well as by FBI Special Agent Wood. Corona then appeared before the federal grand jury where he answered additional questions. During that testimony, Corona was again assured of the protection of the letter "which essentially gives you use immunity for your testimony here today." Corona then testified as to Pelullo's actions in controlling companies and intermingling monies including monies of Compton Press.

The exchanges between AUSA O'Malley and Corona before the grand jury make it clear that the Middle District of Florida investigation was directed primarily to the bankruptcy fraud which occurred in Florida.

However: (i) both Corona and AUSA O'Malley were fully aware of the parallel investigation which was taking place in Newark; (ii) as the evidentiary hearing held in the New Jersey case demonstrates, there is a significant interrelationship between the Newark and Florida charges in that many of the same persons and corporate entities were involved in each and the same modus operandi is alleged in each; and (iii) the grand jury exchanges do nothing to narrow the general immunity conferred in the immunity letter; rather, in their totality, they confirm the breadth of the immunity conferred:

Q: You don't have an attorney here today; do you?

A: No, I don't.

Q. Okay. And you've got the immunity letter, so you understand that what you're telling us isn't going to be used against you here; correct?

A. Right. I do not have an attorney here. I feel comfortable enough with working with you, with the immunity letter—I don't think I really did anything wrong in this case. I really wanted to encase the relationship—or to be more comfortable to talk with you about the Newark thing that concerned me. Although I really don't think I did anything wrong; it's what they did after what I did that kind of made me worried.

MS. O'MALLEY: For the Grand Jury's purpose, that's a separate investigation and a separate jurisdiction.

THE WITNESS: Separate investigation, nothing to do with this.

BY MS. O'MALLEY

Q. Now, you understand that this Grand Jury is looking at the alleged bankruptcy fraud on PIE primarily; correct?

A. Right. I imagine it's how he funneled money through One Plaza out of there, used his management agreement just to pay his expenses that One Plaza was using to pay—to manage all of his entities, probably.

Q. Exactly.

Grand Jury Testimony of Raul Corona, dated October 17, 1991, at p. 32, 1.5–25; p. 33, 1.1–6 (A103)

MS. O'MALLEY: Okay, Do any of the Grand Jurors have any questions for Mr. Corona?

Down on the end.

A. JUROR: You seem to have a great wealth of· knowledge about Mr. Pelullo. Do you have anything—she—the District Attorney has mentioned what this Grand Jury is looking at. Other than what you've already explained, do you have any other dirt or any dust you'd like to let us look at?

THE WITNESS: On Mr. Pelullo, unrelated to what this investigation is?

A. JUROR: Well, primarily related to this investigation.

BY MS. O'MALLEY:

Q. Yes. Let me caution you, we're looking at the Jacksonville venue bankruptcy fraud. Are you aware of any other criminal violations he may have committed in the Middle District of Florida?

Grand Jury Testimony of Raul Corona, dated October 17, 1991, at p. 39, 1.22–25; p. 4033, 1.1–14. (A103).

The government's case against both Pelullo and Corona will be based in good measure upon the thousands of documents which trace the funds allegedly embezzled from the two Compton Press, Inc. employee benefit plans. At the government's request, a hearing pursuant to Rule 104 of the Federal Rules of Evidence was held in order to determine the authenticity of the records and the admissibility of summary charts which, based upon the records, trace the flow of the funds.

During the New Jersey investigation, subpoenas were served on various banks, brokerage houses, law firms and other persons and entities, and pursuant to those subpoenas a vast number of documents was produced. In addition, documents were obtained from the United States Attorney's Office in the Middle District of Florida. These documents had been seized during the course of a search of a warehouse containing many thousands of documents placed there by Pelullo.

At the hearing, the various custodians of the subpoenaed documents identified them and testified about the manner in which they were made and maintained. In addition, Rosario Ruffino testified. He was the Special Agent of the United States Department of Labor, Office of Labor Racketeering, who had primary responsibility for investigating and preparing this case. In his testimony and in a supplemental affidavit he described how the documents had been obtained and how the summary charts had been prepared.

Ultimately, I rejected defendants' objections to the documents and ruled that all of them had been properly authenticated and were admissible. I also held that the information in the summary charts was based upon the documents and that the charts were admissible. I reserved to defendants the right to compare copies of the documents with the originals and to file objections to any individual document which appeared subject to challenge and to move to redact any information on any summary chart which appeared to be based on something other than an authenticated document. Further, my ruling was subject to any decision arising out of Corona's *Kastigar* motions and Pelullo's privilege motion.

It is Corona's contention that the government has violated its commitment that none of the information derived from him would be used against him in any criminal case.

On October 17, 1991, Corona testified before a grand jury in the Middle District. He also met with and provided information to AUSA Kathleen O'Malley and agents of the FBI, in particular, Special Agent Martin Wood.

In his grand jury testimony, Corona named many of the various Pelullo companies for which he worked; he described how Pelullo moved money back and forth between companies; he testified that money was taken out of PIE at Pelullo's direction and funnelled into other companies where it was used for the personal benefit of Pelullo and the Silver Sands Company (which made payments for Pelullo's personal benefit); he identified Pelullo companies and associates,

some of which or whom are a part of the present case.

On October 22, 1991, Special Agent Wood executed an affidavit in support of a warrant authorizing the search of a 2400–square foot warehouse located at 6985 N.W. 82nd Avenue, Miami, Florida. The warehouse contained the records of 25 Pelullo companies, including Compton Press, Inc. and other companies which figure prominently in the embezzlements which are the subject of the present case.

The information which Corona provided was used extensively to support the application for the search warrant. The affidavit was prepared within five days after Corona testified before the grand jury and was debriefed by Special Agent Wood under his immunity. Throughout the affidavit Special Agent Wood states that the information set forth was derived from Corona as well as other persons.

While the United States Attorney in the Middle District of Florida was investigating the Ryder/PIE embezzlements, the United States Attorney's Office in Newark was investigating the Compton Press pension fund embezzlements. On November 4 and 5, 1991, Corona met with AUSA Arthur Zucker and Agents of the Department of Labor. Under the protection of a proffer agreement, he provided information about Pelullo and Compton Press.

Special Agent Ruffino testified at the Rule 104 hearing that agents from Newark traveled to Florida in the Fall of 1991 at the direction of AUSA Zucker, conferred with Special Agent Wood and obtained six boxes of original documents from the FBI search of the Miami warehouse. These boxes were taken to Newark. They relate to the Compton Press financial dealings which are the subject of the indictment in the present case.

Special Agent Ruffino used certain of these documents in the preparation of the case against Pelullo and Corona, and some of them were offered in evidence at the Rule 104 hearing.

In response to Corona's July 1995 *Kastigar* memorandum, the United States Attorney's Office in Newark created a "Chinese Wall" designed to insulate the attorneys responsible for the present case from material which might be deemed to have been derived from information which Corona provided to the government personnel in Florida. AUSAs Lewis S. Borinsky and Mark Costello were assigned to deal with the *Kastigar* and privilege motions and were directed not to disclose to others in the office information which is the subject of those motions.

AUSA Mark W. Rufolo was assigned to the case in February 1995. In his affidavit, he states that he learned most of the background concerning the prosecution from AUSA Jose Sierra, who was previously responsible for the case and from investigative agents assigned to the case. AUSA Rufolo states that he learned of the existence of the documents seized from the Florida warehouse and that he has inspected a limited number of those documents, none of which appeared to be privileged. He has not read the affidavit in support of the search.

AUSA Rufolo states that he has not read transcripts of the Florida state or federal grand jury testimony and that except for the Florida documents, "on no occasion has any Assistant United States Attorney, government agent, or witness provided me with any information, lead, or advice derived from information provided by Raul Corona in the Middle District of Florida." Further, he asserts that except for documents seized in the Florida search, "all of the evidence to be presented by the Government at the trial of *United States v. Raul Corona* derives entirely from sources independent of the information provided by Raul Corona pursuant to letter-immunity in the Middle District of Florida."

Similar affidavits were submitted by AUSA Leslie F. Schwartz who is assisting AUSA Rufolo in the prosecution of this case, by AUSA Jose P. Sierra who preceded AUSA Rufolo as the person in charge of the case and by former AUSA Arthur P. Zucker who was assigned to this case when Corona was brought to Newark in November 1991 for a proffer session. In addition to his other statements, AUSA Sierra recited that "[a]ll of the evidence presented to the Grand Jury that returned the subject indictment was de-

rived entirely from sources independent of the information provided by Raul Corona pursuant to letter immunity in the Middle District of Florida."

Special Agent Wood executed an affidavit in which he described the investigation in which he was involved in October 1991. It concerned allegations of fraud upon the Bankruptcy Court, Middle District of Florida "and related matters involving Leonard Pelullo, his associates, and a group of companies, including ..." the companies listed included several which figure in the Compton Press employee benefit fund embezzlements, for example, Olympia Acquisition, One Plaza Corp., Compton Press, Inc., Webb Press, Inc., Away to Travel South, Ocean Properties, Inc., Silver Sands Investments.

Special Agent Woods stated that "[p]ursuant to this investigation I received information from many sources, including Raul Corona, a former business associate of Leonard Pelullo." He further stated, "I have never disclosed in any manner the substance of any statement made to me by Raul Corona to Agent Ruffino, Assistant United States Attorneys Mark W. Rufolo, Leslie Faye Schwartz and Jose P. Sierra, with former Assistant United States Attorney Arthur Zucker, or with any other person engaged in a criminal investigation and/or prosecution of Leonard Pelullo or Raul Corona in the District of New Jersey."

The government did not submit an affidavit of Special Agent Ruffino who conferred with Special Agent Wood in Florida, reviewed the documents which were seized from the Miami warehouse and selected six boxes of those documents to be brought to Newark for use in connection with the present case. All of the Newark AUSAs who worked on this case must have derived their knowledge of the case primarily from Special Agent Ruffino.

### Corona Motion

■ The government's initial response to Corona's motion is that "the letter-immunity defendant Corona received in the Middle District of Florida was nothing more than a promise on the part of the federal prosecutor from that district not to use any statement, testimony, or information provided by defendant Corona, or any information derived therefrom, against defendant Corona in a prosecution *in that district.*" (Government brief in opposition to Defendant's motion for a *Kastigar* hearing at 15) (emphasis added).

The government's position is patently untenable. The immunity letter signed by the United States Attorney's Office for the Middle District of Florida was expressed in the broadest possible terms. Even though that Office was concerned primarily with bankruptcy fraud committed in that district, its investigation extended to "related offenses by Leonard Pelullo and others." As Special Agent Wood stated in his affidavit, the "related matters" were those "involving Leonard Pelullo, his associates, and a group of companies, including [here Special Agent Wood lists 32 companies, a number of which are involved in the present indictment]." Thus, it is not surprising that the immunity letter assured Corona that none of the information which he gave "may be used against you in *any* criminal case...." There was not the slightest suggestion that this protection was limited to any criminal case in the Middle District of Florida.

The immunity which was given to Corona was not given pursuant to 18 U.S.C. §§ 6001–6005, which prohibits compelled testimony of a witness from being used against him "in *any* criminal case...." The formalities mandated for the granting of statutory immunity were not observed. Yet the immunity letter purported to grant immunity as extensive as that granted by the statute.

■ When a United States Attorney grants immunity informally, the immunity which is granted is measured by the language of the grant. Contractual agreements by which defendants are granted some measure of immunity are, as the government notes, binding and enforceable in accordance with their terms, *see United States v. Quatermain, Drax,* 613 F.2d 38, 41 (3d Cir.), *cert. denied,* 446 U.S. 954, 100 S.Ct. 2923, 64 L.Ed.2d 812 (1980).

■ Here the terms of the agreement were, contrary to the government's position, coextensive with full statutory immunity, and

Corona is entitled to the equivalent of full statutory immunity. *United States v. Skalsky*, 857 F.2d 172 (3rd Cir.1988).

The fact that the immunity letter was given in the Middle District of Florida and not by the United States Attorney in New Jersey is immaterial. The government, as such, is bound by the agreement. To hold otherwise would deprive Corona of his constitutional right against self-incrimination. *United States v. Harvey*, 791 F.2d 294 (4th Cir.1986).

■ Thus, Corona is entitled to immunity equal to that which the immunity statute provides, that is "no testimony or other information compelled ... (or any information directly or indirectly derived from such testimony or other information) may be used against [defendant] in any criminal case." 18 U.S.C. § 6002. The government must show that all the evidence that it uses against a defendant is "derived from ... legitimate source[s] wholly independent of the compelled testimony." *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

■ In the present case, there was no effort either in the United States Attorney's Office in the Middle District of Florida or (until July 1995) in the United States Attorney's Office in the District of New Jersey to build a Chinese wall around the information which Corona provided before the federal grand jury or which he provided ȷ̵ debriefing sessions with AUSA O'Malley and Special Agent Wood. The Florida Office probably saw no need for a Chinese wall, since it did not intend to prosecute Corona. Why the New Jersey Office did not take the necessary precautions is not disclosed in the record.

Normally, in these circumstances a *Kastigar* hearing would be required at which the government would have the burden of showing that all the evidence it is using against defendant is derived from sources independent of information which Corona provided. However, in the present case such a hearing is unnecessary because the record submitted by Corona and the record submitted by the government both establish affirmatively that

the government has used and is using evidence which is derived both directly and indirectly from information which Corona provided under his immunity agreement.

Corona testified extensively before the grand jury in the Middle District of Florida. In that testimony, he provided information about Pelullo and his methods of diverting money from one company to another and often to his own personal use. He identified those who participated in the operations of Pelullo's companies. He named a number of these companies.

This information, together with information he provided in the debriefing session (the substance of which has not yet been ascertained), provided an important basis for the issuance of the search warrant for the Miami warehouse. Excerpts from Special Agent Wood's affidavit in support of the search warrant disclose the significance of the information Corona provided:

4. My investigation, and the investigation conducted by other agents of the FBI and agents of the Interstate Commerce Commission, has produced information from witnesses John Brent and Raul Corona. John Brent was the financial officer of Ryder/PIE from October 16, 1990 to December 11, 1990. Raul Corona worked directly for Pelullo from about 1986 until the end of 1990, assisting him in acquiring and managing various companies. The information received from John Brent and Raul Corona[1] indicates that Leonard Pelullo directed the operation of the company formerly known as Ryder/PIE from the time of its purchase, through on or about December 29, 1990, even though Mr. Pelullo was only designated as a "consultant" to the company.

&ast;   &ast;   &ast;   &ast;   &ast;   &ast;

... Mr. Pelullo and other individuals operated numerous corporations from a building known as the Carlisle Hotel, located at 1250 Ocean Drive, Miami Beach, Florida. I have been advised by Raul Corona and Donna Holman that Pelullo was officially only a "consultant" to these corporations,

---

1. It should be noted that Brent worked for one Pelullo company for only a two-month period, while Corona worked directly for Pelullo from 1986 until the end of 1990.

as well, but that he directed and controlled the operation of these various companies.

7. The companies operated by Pelullo and others from the Carlisle Hotel, based on Secretary of State records and bank records, included, but were not limited to the following:

Silver Sands Investments, Inc.
One Plaza Corp.
Olympia Holding Corp.
OHA, Inc.
PIE Nationwide, Inc.
PIE International
Compton Press, Inc.
Webb Press, Inc.
Away To Travel South
Pintler Creek Range, Inc.
Ocean Properties of Delaware
GH Enterprises, Inc.
G & H Enterprises, Inc.
Inner City Lumber Co., Inc.
Transcon Lines
Growth Financial Corp.
ITOFCA Consolidators, Inc.
Trade & Transportation Trust, Inc.
ITOFCA Group, Inc.
Caravel Holding, Inc.
Caravel Financial Corp.
Red Hat Corporation
Italia
UAE Partners
Ocean Point Property.

8. Information acquired in the course of the ongoing investigation through interviews of Donna Holman, Raul Corona and Janice Larson, and a review of bank records, establishes that Leonard Pelullo used these various other companies, named above, to bleed off the assets of the company formerly known as Ryder/PIE. Mr. Pelullo accomplished this by directing employees of the various companies operated out of the Carlisle Hotel to deposit checks and make numerous wire transfers from Ryder/PIE accounts into accounts in the names of other companies, thereby transmitting assets of Ryder/PIE to the other Pelullo-operated companies. Investigation has established through interview of Donna Holman and Raul Corona, and review of bank records, that Mr. Pelullo would then use these funds for such things as the payment of the mortgage on his home, payment of personal bills, including purchase of his wife's Ferrari, and to run his other companies which were unrelated to the operation of Ryder/PIE.

Thus, the information which Corona provided was an important part of the October 22, 1991 affidavit upon which the Miami warehouse search warrant was issued.

From the warehouse, the FBI seized 904 boxes, 114 file cabinets and 10 file cabinet drawers of corporate and financial records. As disclosed in Special Agent Ruffino's testimony at the Rule 104 hearing, in November 1991 he and other agents went to Florida, reviewed the records, discussed the records and the case with Special Agent Wood and brought back to Newark six boxes of original documents derived from the search of the Miami warehouse. These boxes were taken to Newark and reviewed by the agents. The material relates directly to the Compton Press financial dealings which are the subject of the New Jersey indictment. The material includes numerous letters sent to the various banks, stock brokers and other financial institutions by Corona authorizing many of the transactions at issue in the case. The work papers provided by Agent Ruffino in connection with the May 1995 Rule 104 hearing appear to contain specific references to these letters (*See* Exhibit 106 to Corona Certification where the work papers refer to "per Raul" after particular transactions. *See* for example p. 2, Column 11 of Exhibit 106).

Further, at the Rule 104 hearing, the government offered in evidence to support its summary charts documents taken from the Miami warehouse. It matters not that upon learning of this fact the AUSA representing the government at the hearing withdrew these exhibits.

In its affidavits submitted in connection with the *Kastigar* motion, the government has admitted that "the evidence to be used at the trial of *United States v. Raul Corona* includes, *inter alia*, various documents seized during the search [of the Miami warehouse]" (Rufolo Affidavit, para. 4). The fact that AUSA Rufolo has not read the affidavit supporting the search is irrelevant. The documents seized during the search constituted

information derived from Corona's testimony and statements made during his debriefing, and the government has used and intends to use the documents against him.

The government argues that even if it is established that Corona's immunized testimony and information is used against him, such use is harmless. The government suggests that even without the information provided by Corona, the government could have established that there was probable cause for the search of the warehouse. It is impossible to determine at this juncture whether without Corona's information the government could have identified other persons having knowledge or whether such other persons' knowledge alone would have supported a probable cause finding. What is indisputable, however, is the fact that the information Corona provided constituted an important element of the probable cause affidavit.

This fact distinguishes *U.S. v. Gallo*, 859 F.2d 1078 (2nd Cir.1988), *cert. denied*, 490 U.S. 1089, 109 S.Ct. 2428, 104 L.Ed.2d 986 (1989), upon which the government relies. Even if that case were followed in this Circuit, it would not support the government's position, *see also U.S. v. Nanni*, 59 F.3d 1425 (2nd Cir.1995).

In *Gallo*, the government had conducted an investigation of the management of employee benefit funds of a local Teamsters union. Misuse of the local's president's office led to a further investigation. Julie Miron testified before a grand jury under a grant of immunity. Miron testified about a contract one of his companies had with the local union and about other business dealings he had with the union's president. The union president was indicted and convicted.

Several years later the government initiated a new investigation of the Gambino organized crime family. The FBI obtained court authorization to conduct a wiretap. Three extensions were obtained. In an affidavit submitted in support of a fourth extension, there was included a brief reference to Miron's grand jury testimony. The agent who included the paragraph did not know that it was based on immunized testimony.

The wiretaps produced evidence that implicated Miron in labor pay-off schemes. He was indicted. Before trial, he moved to dismiss the indictment or, alternatively, to suppress the evidence on the ground that the government had improperly used his immunized grand jury testimony to obtain the indictment and evidence. Judge Weinstein denied the motion, finding (i) that the small part of Miron's grand jury testimony referred to in the wiretap affidavit was "of no significance" (ii) that the FBI agent who prepared the affidavit did not know that Miron's testimony had been immunized and (iii) that the government proved beyond a reasonable doubt the existence of wholly independent legitimate sources causing the government to apply for and the district court to grant the renewed wiretap order. None of those three factors exist with respect to the affidavit supporting the Miami warehouse search warrant.

On appeal the majority opinion held that the portion of Miron's grand jury testimony used in the affidavit was subject to a valid claim of privilege. However, the majority opinion, agreeing with Judge Weinstein, found that the government's error was harmless: "Here the record plainly indicates that, except for the single paragraph in question, the government's information came from reliable FBI informants other than appellant, and from direct surveillance, and that the paragraph in question was of negligible significance." 859 F.2d at 1083.

The facts in the present case are totally different. Only one affidavit, not a series of affidavits, supported the application for a search warrant. Information derived from Corona's grand jury testimony and perhaps other immunized disclosures appeared throughout the affidavit and was of major significance. The FBI agent who prepared the affidavit was fully aware that Corona's testimony and other information had been immunized, but because the federal officials in Florida had no intention of prosecuting Corona, this was a permissible use of the information. Finally, the government has not established that the affidavit would have been submitted and the search warrant is-

sued without the information which Corona provided.

The United States Attorney in the Middle District of Florida certainly could not have used the fruits of the Miami search to support an indictment and conviction of Corona. To have done so would have been a flagrant violation of the terms of the immunity letter. For better or worse, the United States Attorney's Office in Newark is bound by that agreement. It is precluded from using the evidence obtained from the Miami search to indict and prosecute Corona.

■ A *Kastigar* hearing might well establish that during his interview with Special Agent Wood and AUSA O'Malley, Special Agent Ruffino received and later used other immunized information. However, in the circumstance of this case such a hearing is unnecessary. It has been established that the government has already used immunized information to obtain the indictment against Corona and that it expects to use such information as evidence at the trial. In these circumstances, the indictment against Corona must be dismissed.[2]

### Background as to Pelullo's Privilege Motion

1. *Eastern District Criminal Proceedings:* Pelullo has been the subject of criminal proceedings in the Eastern District of Pennsylvania for a number of years.

On July 3, 1991 a jury convicted Pelullo of 49 counts of wire fraud and one count of racketeering for engineering schemes whereby Pelullo utilized the Royale Group, Ltd. and its affiliates to defraud American Savings & Loan and Royale's shareholders. On May 12, 1992, the Court of Appeals affirmed the conviction of wire fraud on Count 54, reversed the conviction on all other counts and remanded the case for retrial. *United States v. Pelullo*, 964 F.2d 193 (3d Cir.1992).

Pelullo was retried on 48 counts of wire fraud and one RICO count and was convicted on all counts. After the second trial Pelullo moved for a judgment of acquittal and for a new trial. One of the many grounds for the motion was the claim that the government had violated his right to counsel under the Sixth Amendment by seizing and reviewing documents protected by the attorney-client privilege which were stored in the Miami warehouse.

Judge Kelly, who had tried the case, held an evidentiary hearing. Pelullo testified at the hearing that he had generated numerous files in connection with the grand jury investigation, which culminated in a February 1991 indictment, in connection with the first trial of the indictment which resulted in the July 1991 conviction, and in connection with the first appeal. These files, according to Pelullo, contained privileged materials.

After the trial, this material was placed in boxes which were sealed. The boxes were sent to a building in Miami and ultimately to the warehouse which has been discussed previously in this opinion. According to Pelullo the material in the boxes contained summaries of witnesses' testimony, his and his attorneys' notes about trial strategy, and many other privileged communications and confidential defense documents.

As previously described, the Miami case warehouse was subjected to a government search in October 1991. In an affidavit submitted in connection with the motions in the instant case, Special Agent Wood described the scene that confronted the government agents when they entered the warehouse:

7. ... I and other investigators assigned to the above-described investigation, executed the Search Warrant at the Warrant Location. At that location, we found the records within the warehouse to be in a disorganized state. Files from different entities were stored together, often in the same box, filing cabinet drawer, or filing cabinet. Often such containers were unmarked or marked in a manner inconsistent with the contents of the container. Approximately 904 boxes, 114 file cabinets, and ten file cabinet drawers were seized.

2. In light of this ruling, it is unnecessary to consider the effect of the immunity agreement between Corona and the State of Florida.

8. The materials seized at the Warrant Location were transported to a secure facility in Jacksonville, Florida.

At the hearing before him, Judge Kelly asked Pelullo, "It sounds to me as if you had stored almost all the records for all your businesses in Florida in one place?" Pelullo responded, "Yes."

Judge Kelly concluded "that there was no showing that the 'material was privileged or that it was intended to be confidential'. . . . The Court further found that there was no expectation of privacy when Defendant mixed the allegedly privileged material with those of the various corporations." Further, Judge Kelly found that there was no prejudice to Pelullo because "all government attorneys and agents assigned to this case signed affidavits verifying that at no time did they see or hear any information that Defendant alleges is privileged."

Pelullo appealed his second conviction on multiple grounds, including the ground that the government searched and seized his confidential files which were within the protection afforded by the attorney-client privilege in that they contained confidential documents prepared by himself and his attorney for use at the first Pennsylvania trial and the appeal of his conviction. Although Pelullo's conviction was once again reversed, the Court of Appeals rejected his Sixth Amendment contention:

> Although Pelullo vigorously contends that he never intended to waive his attorney-client privilege, he does not object to the finding of the district court that the government attorneys and agents working on this case have not been exposed to any privileged information. We, therefore, agree with the district court that any alleged violation of attorney-client privilege has not been prejudicial to Pelullo under the circumstances of this case. We need not address whether the privilege has in fact been waived, nor do we endorse the reasoning of the district court underlying its waiver theory.

*U.S. v. Pelullo,* 14 F.3d 881, 906 (3d Cir. 1994).

2. *New Jersey Civil Proceedings:* In September, 1989, Harry J. Gerardi and Coolidge I. Marqueen, two of the trustees of the Compton Press, Inc. employee benefit plans, seeking to protect the assets of the plans, instituted a civil action in the United States District Court in this district, *Gerardi v. Pelullo,* Civil Action No. 89–4069. Named as defendants were Pelullo and Corona along with other individuals and corporate entities. The complaint alleged that Pelullo and the other trustees in league with him had breached their duties to the plans and dissipated fund assets. In particular, the plaintiffs challenged the three transactions which are the subject of the present indictment: (i) the $1.5 million loan to Granada Investment, Inc., (ii) the $1,326 million loan to Away to Travel South, Inc., and (iii) the converting of the $1.7 million annuity contract with Union Mutual Life Insurance Company ("UNUM").

Subsequently, Daniel F. Dacey and Dorothy S. Patten intervened on behalf of all the employees of Compton Press, Inc. and participants in and beneficiaries of the two plans.

On November 14, 1989, the court approved a stipulation of plaintiffs and the defendants appointing Summit Trust Company as trustee of the plans. On January 24, 1990, the defendants and the intervenors entered into a memorandum of understanding. On May 21, 1990, plaintiffs and defendants executed a consent order and settlement agreement which, although not agreed to by the intervenors, was entered by the court on May 22, 1990.

Defendants in the case failed to make certain payments required of them. On July 26, 1990, there was entered an amended stipulation of settlement and consent order agreed to by plaintiffs, defendants and intervenors.

The law firm of Wilentz, Goldman & Spitzer signed the stipulation and order on behalf of defendants David G. Hellhake, David Niefeld, Raul Corona, Moshe Milstein, Alan Weisberger and Compton Press, Inc. Interestingly, the law firm did not appear on behalf of Pelullo, who appeared in the case and signed the stipulation and order "Pro Se." Ultimately, pursuant to the stipulation and order, the plans received back the funds allegedly embezzled by means of the Grana-

da, Away to Travel South and UNUM transactions.

Pelullo now contends that among the documents shipped to the Miami warehouse were privileged attorney-client communications generated during the course of the *Gerardi* case, that these documents disclose defense strategy and observations concerning matters which are the subject of the indictment, that Special Agent Wood deliberately seized and reviewed these documents, knowing they were privileged, and that in the preparation of this case Special Agent Ruffino also reviewed and used the documents.

### Pelullo Motion

A review of the materials which Pelullo and the government have submitted in support of and in opposition to Pelullo's privilege motion leads to the following conclusions: (1) While Pelullo may not have waived a privilege claim, the manner in which he packaged and warehoused his vast array of documents created conditions which negate his charge that the government deliberately seized documents which it knew to be privileged. (2) While Pelullo freely employs the terms "confidential" and "privileged" to describe files and documents, he has not established that any document used by the government in this case is protected by the attorney-client privilege. (3) If any of the documents included in the vast array of documents which the government seized were protected by the attorney-client privilege, Pelullo has not been prejudiced in any way.

In his grand jury testimony, Corona described the manner in which Pelullo conducted his many businesses. He created companies, affiliated companies and subsidiaries by the dozens. He transferred employees back and forth among them. He funnelled money through and between these companies. As Corona described it:

> The other thing is that the way he controlled his companies was like if they're all his—they're all his companies and all the money funnels down into one pool, and wherever he needs it, he sends it, irregardless to what, whose money, which other company it belongs to or what their responsibilities are tomorrow. It's he needs

it today here, this resolves the problem for today, and we'll worry about tomorrow tomorrow. We made it through today. And every day is just making it through that one day.

> He did think about the relationship of the other companies in how he passed the money through to wherever he needed it. He would funnel it through the company that was the parent of the company he was sending it to from the company that was under. But it never—other than that, it never held him back on where he would put the money, as to—it was a matter of strictly where he needed it, where his priorities were the day—the day that you were in front of him.

Grand Jury Transcript at 16.

Notwithstanding the manner in which Pelullo dispatched money here and there, he maintained accurate record of the flow, generating vast amounts of accounting records. A sample of the paper work thus generated is the documentation produced during the Rule 104 hearing in the present case. When one considers that this case concerns the two employee benefit funds of just one of Pelullo's many companies, one can envision how much paper was produced by all of Pelullo's companies. As noted previously, twenty-five of them were listed in the search warrant for the Miami warehouse.

All these records were stored in the Miami warehouse, where the agents conducting the search found approximately 904 boxes, 114 file cabinets and ten file cabinet drawers. As Pelullo testified before Judge Kelly, "Every document that I had generated in the last 20 years was in that warehouse." (Pelullo Tr. at 135). They were in a disorganized state and often mislabeled. Interspersed among the financial and corporate records were the boxes which Pelullo claims contained privileged material. Although Pelullo testified at the hearing before Judge Kelly that he sealed these boxes, the only identification on the boxes was "[s]ome of the boxes were numbered." (Pelullo Tr. at 137). Thus, there was no way the agents searching the warehouse could possibly have known

that Pelullo claimed privilege with respect to the contents.

Faced with a warehouse containing a mass of disorganized documents dealing with the many companies through which it appeared Pelullo had perpetuated fraudulent schemes, the FBI agents pursued the only practical course available to them. They took them to a central location and sought to separate what was pertinent to their investigation from what was not. When this process was completed, they arranged to return 75,000 pounds of documents to Pelullo. Those which they retained, they inventoried.

Pelullo relies upon *United States v. Levy,* 577 F.2d 200 (3d Cir.1978) and its progeny. There, the rule is stated to be:

> The sixth amendment is [ ] violated when the government: (1) intentionally plants an informer in the defense camp; (2) when confidential defense strategy information is disclosed to the prosecution by a government informer; or (3) when there is no intentional intrusion or disclosure of confidential defense strategy, but a disclosure by a government informer leads to prejudice to the defendant.

*United States v. Costanzo,* 740 F.2d 251, 254 (3d Cir.1984).

In the present case, even if it were established that the government happened upon material protected by the attorney-client privilege, such access would have been purely inadvertent. It could well be argued, as Judge Kelly found, that the carelessness with which Pelullo treated supposedly privilege documents constituted a waiver of his privilege. There is no need to reach that question here. What is clear is that Pelullo's method of storing his documents negates any claim that the government deliberately seized privilege material. The FBI agents could not have known that any particular box or drawer contained privileged material.

■ Therefore, the legal standard to be applied in this case is that set forth in *United States v. Morrison,* 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981). In *Morrison* the Supreme Court held that where a Sixth Amendment violation has occurred, "absent demonstrable prejudice or substantial threat

thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been intentional." *Id.* at 365, 101 S.Ct. at 668.

■ Applying *Morrison,* a defendant must first show that the government has made use of privileged information. In the present case, Pelullo has failed to establish that the government has made use of or even had access to any privileged documents relevant to the charges contained in the indictment.

■ Two privileges are implicated. The first is the work-product doctrine which protects from discovery materials prepared or collected by an attorney "in the course of preparation for possible litigation." *Hickman v. Taylor,* 329 U.S. 495, 505, 67 S.Ct. 385, 391, 91 L.Ed. 451 (1947). It applies in both civil and criminal litigation.

■ The second privilege, of course, is the attorney-client privilege. Its parameters are set forth in Judge Wyzanski's oft-quoted statement in *United States v. United Shoe Machinery Corp.,* 89 F.Supp. 357, 358–59 (D.Mass.1950):

> The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

Pelullo must first show that the government has used documents which were either protected by the work-product doctrine or by the attorney-client privilege.

In an effort to meet this burden, Pelullo has submitted the inventory prepared by Special Agent Wood which describes the contents of 160 boxes and 36 file cabinets.

These are the documents which the government retained after shipping the 75,000 pounds of documents back to Pelullo.

The inventory confirms Special Agent Wood's description of the contents of the warehouse and the intermingling of categories of documents. A number of the boxes contained materials relating to legal matters, some specifically relating to the *Gerardi* civil action. Often, if not usually, this legal material was kept with material which had nothing to do with legal matters.

For example, Box 1 contained "legal motions," "Raul Corona reading files containing internal memo's, correspondence re: Granada v. DWA." However, the remaining contents of Box 1 consisted of correspondence, loan and security agreements, promissory notes, Rolodex containing phone numbers, desk calendars.

The inventory of Box 37 consisted of the notation "This box contains litigation documents re: *Gerardi v. Compton Press*— 6/15/90."

Scattered throughout the inventory of boxes and file cabinets were references to legal proceedings and occasionally specifically to the *Gerardi* case. However, there is nothing which demonstrates that any of the documents referred to were work-product or attorney-client communications. The vast majority of the material as listed in the inventory clearly related to Pelullo's host of corporations and business dealings.

In supplemental appendices, Pelullo provided copies of several documents culled from the materials which Special Agent Wood had seized and which Special Agent Ruffino brought back with him from Miami to Newark for use in the present case. Pelullo urges that these were privileged documents entitling him to the relief he seeks. Clearly, they are not privileged.

I will overlook the fact that in the *Gerardi* case Pelullo was not the client of the law firm of Wilentz, Goldman & Spitzer, since he was appearing *pro se* in that case. He might be able to advance some sort of a joint defense theory and claim the privilege and I will assume, therefore, that he is entitled to assert a privilege as to communications with that firm which meet the *United Shoe Machinery Corp.* test.

An examination of the eighteen documents contained in one supplemental appendix discloses that none meet that test. It is unnecessary here to describe each document. A few examples will suffice.

The first is a letter from Pelullo to Fred Schwartz, Esq. of the Adorno law firm in Coconut Grove, Florida. It instructs Schwartz to deposit two checks into the firm's trust account and to disburse checks from the trust account in the corresponding amounts to the Internal Revenue Service. No advice was sought or obtained. This was simply a transfer of funds, something which might or might not be relevant in one or another of the proceedings involving Pelullo. During the Rule 104 hearing in the present case, it was shown that allegedly embezzled monies from the Compton Press employee benefit plans occasionally passed through attorney trust accounts on their tortuous way to their ultimate destinations.

Similarly, the second communication is simply a memorandum from Janice Larson to Deanne Shulkin, Esq., transmitting a resolution of Equity Finance Group, Inc., and related agreement and certain Securities and Exchange Commission documents, none of which is privileged.

A May 18, 1990 letter from Kenneth B. Falk, Esq. to Pelullo is accompanied by a copy of a letter from the attorney for the trustee of the plans setting forth interest rates. The letter simply recites the position of the trustee with respect to the payment of interest.

There are a number of other letters from attorneys (and in some cases non-attorneys) transmitting non-confidential documents or information.

A March 6, 1991 one-sentence letter from Kenneth B. Falk, Esq. to Pelullo accompanies an invoice or invoices for services in a litigated matter entitled *Turchi v. Milstein.* This case does not appear to have any relationship to the *Gerardi* case or the instant case. The statement of services is a financial record, not a privileged communication. If it were relevant in a legal proceeding and if by

chance privileged information were disclosed in the recital of services rendered, a Court, no doubt, would redact such information and admit the balance of the statement. However, it has no relevance in the instant case.

Pelullo seeks to extract from Ruffino's Rule 104 hearing testimony evidence that he reviewed privileged documents. That is not a fair reading of the testimony. Ruffino obviously saw Special Agent Wood's inventory which listed documents which Pelullo had described as legal documents. As discussed above, Pelullo's descriptions do not convert non-privileged documents into privileged ones.

Ruffino testified that he had read legal papers in the *Gerardi* case. Of course, he had. He followed the civil proceedings in this court with care, attending hearings and reviewing the papers filed in connection with it as he prepared the criminal case against Pelullo and Corona. There is no suggestion that he reviewed privileged documents belonging to Pelullo.

The Ruffino testimony, the affidavit of Special Agent Wood and the affidavits of the Assistant United States Attorneys who were or are assigned to this case establish that none of the agents or government attorneys working on this case were exposed to privileged documents.

Even if it were concluded that one or more of the documents which Pelullo has produced is entitled to the protection of the attorney-client privilege, there has been absolutely no showing of prejudice.

It is useful to compare the situation which prevailed in the Eastern District of Pennsylvania with the instant criminal case. There Pelullo and his attorneys had dealt with proceedings leading up to an indictment. They then prepared the case for trial and ultimately went through the trial of the case. After the jury found defendant guilty, they prepared an appeal. These proceedings generated a huge number of documents which, according to Pelullo, were boxed and shipped to the Miami warehouse. They were subject to the seizure which resulted from the search of the warehouse. It would not be surprising if these documents went to the heart of the merits of Pelullo's defense of the indictment brought against him. Even so, Judge Kelly found no prejudice and the Court of Appeals affirmed.

In the present situation, the *Gerardi* case, which parallels the indictment, was a civil case. Almost as soon as the complaint was filed, the parties agreed to the appointment of a new trustee. It does not appear that the case was defended vigorously, if at all, on the merits. Rather, it was promptly settled. The few documents which Pelullo has produced relating to that case concern details of settlement and (with the possible exception of some meaningless comments on a letter from Gerardi and Marqueen to the other trustees) have nothing to do with Pelullo's position on the merits. Thus not only was there no prejudice, there was not even the opportunity for prejudice.

In these circumstances, Pelullo's motion to dismiss the indictment or for other relief must be denied.

I shall enter an appropriate order granting Corona's motion and denying Pelullo's motion.